**TEXAS REAL ESTATE HOLDINGS, INC., Individually, and d/b/a/ Rosslyn Heights Apartments; Ranga Kakarala, Individually and d/b/a R.K. Management, Appellants,**

v.

**Nhu Thao QUACH and Tan Phuoc Quach, Individually and as Next Friends of Bao Tram Quach and Tiffany Quach, Minor Children, Appellees.**

No. 01–00–01270–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Oct. 31, 2002.

Rehearing Overruled Jan. 9, 2003.

John L. Dagley, Laura P. Haley, Campbell, Harrison & Wright, Thomas C. Wright, The Wright Law Firm, Houston, for appellants.

Michael A. Moriarty, Moriarty & Madigan, Houston, for appellees.

Panel consists of Justices NUCHIA, RADACK, and PRICE.

## OPINION

FRANK C. PRICE,* Justice.

This is a premises liability case arising out of a carjacking incident that took place at an apartment complex. The appellees/plaintiffs, the Quach family, were the victims of a violent carjacking in the parking lot of an apartment that they rented from defendants/appellants, Texas Real Estate Holdings and R.K. Management (collectively, Rosslyn Heights Apartments). The Quach family sued Rosslyn Heights Apartments, alleging that the apartments provided negligent security, thereby failing to protect them from the criminals. After a jury trial, the Quachs were awarded approximately 1.1 million dollars in damages. We reverse and render.

### A. Background

The Rosslyn Heights Apartments are located at 7015 Woodsman Trail, in Houston, Texas. In September 1997, the 60–unit apartment complex was owned by Texas Real Estate Holdings, Inc., and managed by R.K. Management. Tan Phuoc Quach and Nhu Thao Quach lived in the apartments with their two daughters, twelve-year-old Bao Tram (Tracey) Quach, and five-year-old Tiffany Quach.

On September 12, 1997, the Quach family was returning home after visiting an aunt. Mr. Quach was driving the family's van, Mrs. Quach was in the passenger seat, and Tracey and Tiffany were riding in the

---

* The Honorable Frank C. Price, former justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

back. As Mr. Quach was pulling into a vacant parking space, two carjackers approached the van, one on the passenger side, and one on the driver's side. As Tracey opened the van's sliding door, she noticed the carjacker on the passenger side, so she bolted out of the van and ran toward the front of the apartment complex. The carjacker on the passenger side opened Mrs. Quach's door, put a gun to her head, demanded her purse and car keys, and told her to get out of the vehicle. The other carjacker opened the driver's side door, put a gun to Mr. Quach's head, and demanded the keys to the van. As Mrs. Quach was trying to get Tiffany out of the rear of the van, the carjacker, who had put his gun to Mr. Quach's head, fired his gun. The bullet grazed Mr. Quach's temple, but struck Mrs. Quach in the face. After the carjackers threw the Quachs from the van, the carjackers sped away in the van. They were never apprehended.

As a result of this horrific crime, Mrs. Quach suffered permanent neurological damage and disfiguring scars to the face. She was required to undergo several surgeries, and at least five more surgeries were expected at the time of trial. Other than the slight graze to Mr. Quach's temple, the other family members suffered no physical injuries, though they all suffered post-traumatic stress.

### B. Duty to Provide Protection from Criminal Acts of Third Parties?

In issue one, Rosslyn Heights Apartments contend that the trial court erred by denying its motion for judgment notwithstanding the verdict because it owed no duty, as a matter of law, to protect the Quach family from a random, violent attack by an unknown third party. Specifically, Rosslyn Heights Apartments contend that the actions of the carjackers were unforseeable. Whether Rosslyn Heights Apartments could have foreseen the likelihood of violent criminal activity within its complex, thus, giving rise to a duty to protect against such criminal activity, is a question of law for the court to decide. *See Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 756 (Tex. 1998).

Generally, a person has no legal duty to protect another from the criminal acts of a third person. *Id.; Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex. 1995). However, one may nevertheless be held liable if the criminal activity is a foreseeable result of one's own negligence. *Haight v. Savoy Apartments,* 814 S.W.2d 849, 853 (Tex.App.-Houston [1st Dist.] 1991, writ denied). A landlord "who retains control over the security and safety of the premises" may be held liable to invitees for criminal acts by third parties, if, and only if, the criminal acts were foreseeable. *Timberwalk,* 972 S.W.2d at 756, (*quoting Centeq,* 899 S.W.2d at 197).

"Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable." *Id., (quoting Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996)). "When the 'general danger' is the risk of injury from criminal activity, the evidence must reveal 'specific previous crimes on or near the premises' in order to establish foreseeability." *Id.*

The supreme court has set forth five factors that we must consider in determining whether the criminal activity in this case was foreseeable, those being: (1) proximity, (2) recency, (3) frequency, (4) similarity, and (5) publicity. *See id.* at 759.

> [C]ourts should consider whether any criminal conduct previously occurred on or near the property, how recently it occurred, how often it occurred, how similar the conduct was to the conduct

on the property, and what publicity was given the occurrences to indicate that the landowner knew or should have known about them.

*Id.* at 757. With these factors in mind, we review the evidence presented at trial to determine whether Rosslyn Heights Apartments had a duty to implement additional security measures, i.e., whether violent criminal activity, such as carjacking, was foreseeable.

### Proximity

■ "For a landowner to foresee criminal conduct on property, there must be evidence that other crimes have occurred on the property or in its immediate vicinity. Criminal activity occurring farther from the landowner's property bears less relevance because crime rates may be expected to vary significantly within a large geographic area." *Id.*

In this case, the parties dispute what is meant by the "immediate vicinity" of Rosslyn Heights Apartments. At trial, the Quach's expert, David Salmon, testified that he used Houston Police Department beat statistics to prepare a crime analysis for the immediate vicinity of Rosslyn Heights Apartments. The record shows that police beat 6B30 encompasses approximately nine square miles, including Rosslyn Heights Apartments. Salmon testified that in the years 1995, 1996, and 1997, beat 6B30 ranked 8th, 7th, and 6th out of Houston's 100 plus police beats in index crimes.[1] Similarly, for the same years, beat 6B30 ranked 12th, 13th, and 11th in violent crimes. Thus, Salmon concluded that Rosslyn Heights Apartments was located in a high crime area. Salmon did not provide any evidence about specific crime on properties adjacent to, or in the same neighborhood, as Rosslyn Heights Apartments.

Rosslyn Heights Apartments, however, relied on census tract evidence in evaluating crime in the immediate vicinity. A census tract is a much smaller area than a police beat. While police beat 6B30 is approximately nine square miles, U.S. census tract 540.12, which encompasses Rosslyn Heights Apartments, covers only 3.5 square miles. In 1997, the crime rate in tract 540.12 for robbery was 122 out of 100,000 residents versus 452 out of 100,000 residents for Houston overall. For the same time period, the crime rate in tract 540.12 for aggravated assault was 71 out of 100,000 residents, while the overall aggravated assault rate in Houston was 664 out of 100,000 residents.

Thus, two very different scenarios are presented when considering crime in the "immediate vicinity" of Rosslyn Heights Apartments. If we were to utilize the police beat statistics, it would appear that the apartments were in an area of high crime. However, the census tract evidence shows that residents in the apartments and the 3.5 miles around it were actually less likely to be victims of robbery or aggravated assault than Houstonians considered as a whole.

We have examined the relevant case law and have determined that the courts, generally, rely on small geographic areas in considering crime in the vicinity. *See Timberwalk,* 972 S.W.2d at 759 (considering apartment complex, neighboring complex and one mile radius of apartment complex); *Dickinson Arms–REO, L.P. v. Campbell,* 4 S.W.3d 333, 338–39 (Tex.App.-Houston [1st Dist.] 1999, pet. denied) (considering apartment complex, nearby hotel,

---

[1] Index crimes are those that are reported to the Federal Bureau of Investigation under the Uniform Crime Reporting Program, and include murder, non-negligent manslaughter, rape, robbery, aggravated assault, burglary, larceny theft, motor vehicle theft, and arson.

two nearby apartment complexes, all located within one square mile radius); *Plowman v. Glenn Willows Apartments*, 978 S.W.2d 612, 618 (Tex.App.-Corpus Christi 1998, pet. denied) (considering apartment complex and neighborhood surrounding complex).

Therefore, as required by the supreme court, we find it necessary to examine criminal activity in "narrow geographic areas in analyzing the foreseeability of criminal conduct." *Timberwalk*, 972 S.W.2d at 757. This is because "[s]tatistics regarding large or undefined geographic areas do not by themselves make crime foreseeable at a specific location." *Id.*

Police beat 6B30 is not a "narrow geographic area"; it covers nine square miles. As such, the statistical evidence of crime within beat 6B30 does not, in and of itself, make the possibility of violent crime at the Rosslyn Heights Apartments foreseeable. The census tract, in contrast, is a smaller geographic area and has been considered by the supreme court in determining crime in the immediate vicinity. *See Id.* at 752.

Thus, we turn to the evidence presented regarding crime on the premises of the apartments and its frequency.

*Recency and Frequency*

The evidence of the crime at the apartment complex was undisputed. The evidence showed that between 104 and 107 call reports were made from the apartments to the police during the two years before the shooting. Call reports include hang-up calls, mistake calls, missing person calls, information calls, calls for medical assistance, and calls to report suspected criminal activity.

Of the 100 plus call reports, 27 or 28 incident reports were made. Of the 27 or 28 incident reports, only nine index crimes were reported. These nine index crimes were the only crimes the Quachs' expert deemed "relevant" to his analysis, and included the following:

- November 28, 1995—auto theft
- May 11, 1996—aggravated assault
- May 18, 1996—auto theft
- February 2, 1997—theft of speakers from vehicle
- February 24, 1997—theft of cloth carrying case and organizer from vehicle
- March 9, 1997—auto theft
- March 14, 1997—theft of floormats and dayplanner from vehicle
- May 11, 1997—theft of stereo from vehicle
- May 14, 1997—theft of tail lights from vehicle

There was no other crime on the premises until the carjacking on September 12, 1997.

*Similarity*

In addressing the similarity of the previous crimes with the crime at issue in the case, the supreme court acknowledges that "[t]he prior crimes need not be identical." *Timberwalk*, 972 S.W.2d at 758. However, the court further noted that

> [a] string of assaults and robberies in an apartment complex make the risk of other violent crimes, like murder and rape, foreseeable. On the other hand, a spate of domestic violence in the complex does not portend third party sexual assaults or robberies.

*Id.*

Of the nine crimes detailed above, only one—the aggravated assault—involved violence. However, it involved a domestic dispute. George Oliver, a tenant of the apartment complex, got into a dispute with Lloyd Arcement, his cousin, over a card game, and Arcement hit Oliver on the head with a liquor bottle. Oliver later died, and Arcement pleaded guilty to aggravated assault.

Therefore, in the two years before the carjacking there were no other incidents of stranger-initiated, violent crime. Disregarding the aggravated assault incident between relatives, there were eight crimes left to consider—three auto thefts and five thefts from vehicles. None of the crimes involved weapons, there were no injuries, and there were no confrontations between perpetrators and victims.

*Publicity*

Publicity was not a factor in this case because, other than the general statistical evidence of crime rates within the police beat and census tract, the only crimes used in our analysis actually occurred on the premises of Rosslyn Heights Apartments. Thus, those crimes were known to the apartments' management.

### C. Case Law & Analysis

■ In *Dickinson Arms*, this Court held that a carjacking at an apartment complex was *not* unforeseeable as a matter of law because there was evidence that, in the three and one-half years before the carjacking (1) there had been 184 reported crimes at the apartment complex, 60 of which were categorized as "true crimes", i.e., burglaries, auto thefts, assaults, and thefts; (2) there was gang activity in the neighborhood; and (3) two other nearby apartment complexes and a hotel had "bad reputations" for criminal activity. 4 S.W.3d at 346–49.

In contrast, in this case, in the two years prior to the carjacking, there were just 27 or 28 reported crimes at the complex, only nine of which were index crimes. There was no evidence of gang activity in the neighborhood, and no other evidence that nearby complexes or hotels had "bad reputations" for criminal activity. As such, we find that *Dickinson Arms* is distinguishable on its facts.

This case is more like the *Timberwalk* case. In *Timberwalk*, the victim was sexually assaulted in her apartment. 972 S.W.2d at 751. At the complex, there had been a tire-slashing, a car burglary, and a car theft. *Id.* at 759. Additionally, in the year preceding the assault, there was one sexual assault within a one-mile radius of the complex and six other assault-type crimes in neighboring complexes. *Id.* Nevertheless, the supreme court, noting the absence of "violent personal crime" in the complex, concluded that the risk that a tenant would be sexually assaulted was unforeseeable. *Id.* As such, as a matter of law, the complex owed no duty to the tenant to provide additional security. *Id.*

Applying the *Timberwalk* factors to this case, we conclude that the carjacking was unforeseeable to appellants. In two years before the carjacking, there was no violent crime in the complex, save one domestic assault between relatives. The three car thefts and five thefts from cars did not involve any confrontations, violent or otherwise, between the thieves and their victims. There was no evidence of any specific crimes of any nature in the immediate surroundings. In fact, the evidence showed that the census tract in which the complex was located, which covered 3.5 square miles, actually had a lower rate of violent personal crime than the city of Houston as a whole. *See Timberwalk*, 972 S.W.2d at 752 (comparing rate of sexual assault in census tract with rate of sexual assault in city as a whole).

The carjacking, although tragic, was unforeseeable to appellants. Thus, the appellants owed no duty—as a matter of law—to provide additional security to prevent the crime. Therefore, the trial court erred by denying Rosslyn Heights Apartments' motion for judgment notwithstanding the verdict. We sustain issue one.

Accordingly, we reverse the judgment of the trial court and render judgment that the Quachs take nothing from Rosslyn Heights Apartments. In light of our disposition of Rosslyn Heights Apartments first issue, we need not address its remaining issues and decline to do so.