**TRAMMELL CROW CENTRAL TEXAS, LTD., Appellant,**

v.

**Maria GUTIERREZ, Individually and as Next Friend of Andrew Martinez; Christopher Martinez; and Alex Martinez; and Karol Ferman, Individually and as Next Friend of Luis Angel Gutierrez, Appellees.**

No. 04–05–00056–CV.

Court of Appeals of Texas, San Antonio.

Dec. 20, 2006.

W. Wendell Hall, Lara Johnson, Rosemarie Kanusky, Fulbright & Jaworski L.L.P., San Antonio, for appellant.

Kimberly S. Keller, The Keller Law Firm, San Antonio, Joe B. Stephens, The Stephens Law Firm, Katy, for appellees.

Sitting: ALMA L. LÓPEZ, Chief Justice, CATHERINE STONE, Justice, SARAH B. DUNCAN, Justice, KAREN ANGELINI, Justice, SANDEE BRYAN MARION, Justice, PHYLIS J. SPEEDLIN, Justice, REBECCA SIMMONS, Justice.

## EN BANC OPINION

Opinion by SANDEE BRYAN MARION, Justice.

The Quarry Market is a 53–acre shopping mall located in San Antonio, which in 2002 was managed by Trammell Crow Central Texas, Ltd. On February 18, 2002 at approximately 12:30 a.m., Luis Gutierrez and his pregnant wife, Karol Ferman, were leaving a movie theater located in the Quarry Market, when Karol heard a gunshot. Turning toward the sound, Karol saw the shooter, dressed in black with a black hood or ski mask over his or her face. Although she did not believe the first shot hit anyone, she thought a second shot hit her husband in the shoulder. Gutierrez fell to the ground, then got up, and the couple started running towards the south end of the Quarry Market. Then Karol fell to the ground and, no longer able to move, crawled under a car, where she remained until the ambulance arrived. There were no other witnesses to the shooting. Gutierrez later died at the hospital from four gunshot wounds, and the San Antonio Police Department classified his death as a murder. One month after Gutierrez's death, Karol gave birth to a son, four months premature.

On March 28, 2002, Maria Gutierrez (Gutierrez's mother) and Karol Ferman, individually and on behalf of her infant son, filed the underlying lawsuit alleging Gutierrez's death was proximately caused by Trammell Crow's negligent failure to provide adequate security. The petition was later amended to add claims by Maria Gutierrez on behalf of Gutierrez's three minor children from a previous relationship. Finding Trammell Crow negligent, the jury returned a verdict in favor of the plaintiffs and Trammell Crow appeals. On appeal, Trammell Crow asserts it owed no duty to Gutierrez because his murder was not foreseeable and, even if foreseeable, the plaintiffs failed to show that any negligence on Trammell Crow's part proximately caused Gutierrez's murder. We affirm.

### DUTY

In its first issue, Trammell Crow asserts that as a matter of law it owed no duty to Gutierrez. "The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question." *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996). As a general rule, "a person has no legal duty to protect another from the criminal acts of a third person." *Id.; Timberwalk Apts., Partners, Inc. v. Cain,* 972 S.W.2d 749, 756 (Tex.1998). However, an exception to the general rule exists in that one who controls premises has "a duty to use ordinary care to protect invitees from criminal acts of third parties if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee." *Timberwalk,* 972 S.W.2d at 756 (citation omitted). "[W]e consider not only the foreseeability of the

general criminal act but also the foreseeability that the victim might be injured by the act. Stated more broadly, we determine both the foreseeability of the general danger and the foreseeability that a particular plaintiff—or one similarly situated—would be harmed by that danger." *Mellon Mortgage Co. v. Holder*, 5 S.W.3d 654, 655 (Tex.1999).

## A. Foreseeability Of General Danger

With regard to foreseeability of the general danger, the *Timberwalk* Court held as follows:

> "Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable." When the "general danger" is the risk of injury from criminal activity, the evidence must reveal "specific previous crimes on or near the premises" in order to establish foreseeability.
>
> The foreseeability of an unreasonable risk of criminal conduct is a prerequisite to imposing a duty of care on a person who owns or controls premises to protect others on the property from the risk. Once this prerequisite is met, the parameters of the duty must still be determined. "Foreseeability is the beginning, not the end, of the analysis in determining the extent of the duty to protect against criminal acts of third parties."

*Id.* at 756 (footnotes omitted).

We do not determine whether a risk of criminal conduct is foreseeable in hindsight; instead, we do so "in light of what the premises owner knew or should have known before the criminal act occurred." *Id.* at 757. Evidence of specific previous crimes on or near the premises is relevant to the issue of foreseeability of criminal activity. Thus, we consider the following factors: whether any criminal conduct previously occurred on or near the property, how recently it occurred, how often it occurred, how similar the conduct was to the conduct on the property, and what publicity was given the occurrences to indicate that the landowner knew or should have known about them. *Id.*

### 1. Proximity and publicity

We examine publicity surrounding prior crimes to "determine whether a landowner knew or should have known of a foreseeable danger." *Id.* at 758. Also, "[f]or a risk to be foreseeable, there must also be evidence of criminal activity within the specific area at issue, either on the landowner's property or closely nearby." *Id.* Here, it is undisputed that Trammell Crow knew about the crimes reported at the Quarry Market premises. Accordingly, our foreseeability analysis presumes knowledge and proximity, and turns on the recency, frequency, and similarity of the reported crimes occurring at the Quarry Market.

### 2. Recency, frequency, and similarity

"The occurrence of a significant number of crimes within a short time period strengthens the claim that the particular crime at issue was foreseeable." *Id.* "On the other hand, the complete absence of previous crimes, or the occurrence of a few crimes over an extended time period, negates the foreseeability element." *Id.* As to the similarity factor, the *Timberwalk* Court cautioned against any requirement that "the exact sequence of events that produced the harm" be foreseeable, or that the prior crimes be identical. *See id.* at 756, 758. *Timberwalk* calls for an examination of whether the previous crimes are "sufficiently similar" to the crime in question. *Id.* at 758.

Police incident reports admitted into evidence and relied upon by both parties indicate that during the two years preced-

ing Gutierrez's death on February 18, 2002, the Quarry Market was the stage for the following violent crimes: [1]

1. Thursday, January 24, 2002 at 2:05 p.m.—When a store manager chased a shoplifting suspect out into the parking lot to get the suspect's license plate number, the suspect got into a vehicle and steered his vehicle towards the manager, striking the manager's left elbow with the driver's side mirror and causing the manager to spin and fall. This crime was classified by the SAPD as "robbery-bodily injury."

2. Sunday, January 13, 2002 at 5:48 p.m.—As a woman started to open her car door, a suspect placed an arm around her, placed a gun to her chest, and told her to give him her purse. The suspect fled in a vehicle. This crime was classified by the SAPD as "aggravated robbery-deadly weapon."

3. Monday, October 22, 2001 at 11:45 p.m.—As a woman and her companion were walking in the parking lot, they noticed a man standing in front of a parked car, inside of which another individual sat in the driver's seat. The man approached the couple and asked for the time. The woman gave the man the time; and the two continued walking away. The man then demanded their money. As they continued walking, the driver in the parked car stepped out of the car and pointed a gun at them that looked like an Uzi and told the woman "get on the floor and give me all your money or I'm oging [sic] to kill you!!!" Fearing for their lives, the couple was going to comply. The first man then grabbed the woman's purse, and told the

couple not to turn around and look at him. He got into the car, and fled with the other man. This crime was classified by the SAPD as "aggravated robbery-deadly weapon."

4. Monday, July 9, 2001 at 9:44 p.m.—As a man was sitting in his car with his girlfriend, a suspect tapped on his window with a gun, told the man he needed his vehicle, gave the man time to remove his belongings from the car, and then took the car. This crime was classified by the SAPD as "aggravated robbery-deadly weapon."

5. Wednesday, December 20, 2000 at 7:35 p.m.—A suspect entered a bank located inside a Quarry Market store and presented the teller a handwritten note. The note stated that it was a robbery and the teller should not move or he would be killed and demanded the money in the top drawer. The suspect then handed the teller a large manilla envelope and told the teller to put the note and the money in the top and bottom drawers in the envelope. As the suspect left, he told the teller there were three others in the store with him. This crime was classified by the SAPD as "robbery."

6. Monday, December 18, 2000 at 7:24 p.m.—While seated inside a restaurant, a woman's purse was stolen. When she pursued the purse snatcher into the parking lot, he pushed her away, jumped into the passenger side of a waiting vehicle, and sped away. This crime was classified by the SAPD as "robbery-bodily injury."

---

1. All experts agreed that the following are "violent crimes": murder, rape, robbery, and aggravated assault. It is also undisputed that the Quarry Market experienced over 200 other crimes on the premises, including 14 burglaries, 132 thefts, 20 auto thefts, 13 simple assaults, 37 acts of vandalism, and 1 person in possession of a switch blade knife on the premises. Because these other crimes are not considered violent crimes, we do not consider them in our foreseeability analysis.

7. Saturday, May 20, 2000 at 6:53 p.m.—A suspect entered a store, told an employee he had a heat-activated hand grenade, and demanded money. The employee complied, turning over approximately $750. The purported hand grenade was found to be simulated. When the suspect fled on foot to his vehicle, two off-duty officers working security attempted, on their bicycles, to pursue the vehicle as it left the parking space but they were unable to get close enough to get the license plate number. This crime was classified by the SAPD as "aggravated robbery."

8. Sunday, May 7, 2000 at 1:10 a.m.—As a man was walking from a store to his vehicle, two people in a passing car first asked for directions and then said, that if he did not want to die, he should give them his wallet. When the man said he did not have a wallet, the people in the car asked him for his pager, cellular telephone, and keys. While the man relinquished these items, one of the suspects pointed an unknown object covered by a black trash bag. This crime was classified by the SAPD as "robbery-deadly weapon."

9. Monday, April 17, 2000 at 12:30 a.m.—As a man was exiting the movie theater, two men asked if he was "some big shot" and followed the man back into the theater. The two suspects then began to hit the man, knocking him down, and reached into his pocket and took his money, credit cards, necklace, and military ID. The complainant said someone told the suspects to leave him alone, and they fled in a vehicle with a third suspect. The complainant also said the suspects dropped a cellular phone as they were assaulting him. This crime was classified by the SAPD as a "robbery-bodily injury."

10. Wednesday, March 29, 2000 at 6:40 p.m.—As a woman exited a store, a man grabbed her purse. She pulled back; but he pushed her, over-powered her and took her purse, ran off, and got into a waiting vehicle. When a witness tried to block the suspect with her vehicle, he rammed her car and fled. This crime was classified by the SAPD as "robbery."

▬ Here, there is no doubt the prior crimes are "sufficiently similar" to the crime against Gutierrez. Each of these violent crimes involved injury to a person or the threat of injury and occurred within two years of Gutierrez's murder. Most involved the use of a deadly weapon. Nevertheless, the dissent argues that none of these crimes are remotely similar to Gutierrez's murder because none of the prior crimes involved a shooting or a murder. However, the *Timberwalk* Court recognized that "[a]n apartment intruder initially intent upon stealing may decide to assault a tenant discovered inside, even if the tenant avoids confrontation." *Id.* So too, an armed individual intent upon stealing may decide to discharge his weapon in a manner that leads to the injury or death of the victim. "A string of assaults and robberies in an apartment complex make the risk of other violent crimes, *like murder* and rape, foreseeable." *Id.* (emphasis added). Similarly, a string of assaults and robberies in a shopping mall and its large parking lot make the risk of other violent crimes, like murder, foreseeable. We conclude that a string of similar violent crimes occurring on the property over a two-year period establishes that the general danger of a person being murdered at the Quarry Market was foreseeable.

**B. Foreseeability That Gutierrez Would Be Murdered**

The next inquiry is whether it was foreseeable that Gutierrez, or a person similar-

ly situated, could be murdered on the premises. *Mellon Mortgage*, 5 S.W.3d at 656–57 (holding that although rape in parking garage was foreseeable, it was not foreseeable that the plaintiff would be stopped, several blocks away from the garage, by a third party over whom defendant had no control, and taken to the garage where she was raped).

Trammell Crow asserts Gutierrez died as a result of a targeted "hit" and it could not foresee a "reprisal killing." Trammell Crow characterizes Gutierrez as being concerned about "the criminals he 'ratted on' ". Relying on this characterization, the manner in which Gutierrez was shot, and the fact that his wallet was never recovered by the police, Trammell Crow concludes Gutierrez was targeted for murder and not robbed; something that could not have been reasonably foreseen.

The record reveals that a few weeks prior to his murder, Gutierrez provided San Antonio police officers with the names of individuals involved in a string of smash and grab burglaries. After his meeting with the police, Gutierrez received a threatening call on his cellular telephone. Gutierrez allowed the police officers to listen to the message, but according to one of the officers who testified, Gutierrez "wasn't that worried." When asked if the police could do anything else for him, Gutierrez responded, "No, all I want is the money—I don't need anything else—so I can get myself out of this." The police paid him $250 to assist in relocating his mother. About one week after his final conversation with the police, Gutierrez was murdered. After his murder, the burglary investigators gave the names of the individuals whom Gutierrez "ratted on" to the homicide detectives. Although the homicide detectives investigated these individuals, the police were unable to tie them to Gutierrez's murder. Despite a full investi-

gation, no one has been arrested or convicted for the murder.

Gutierrez's wife testified that earlier in the day of the murder, he and his mother went to the cemetery to visit his father's grave site. Later that evening, the couple decided to go to a late movie at the Quarry Market. Karol said she did not notice her husband as being nervous, concerned, or scared. She said he was wearing a necklace, bracelet, watch, and ring. Karol stated in an earlier deposition that she did not know if her husband had his wallet at the movie theater, but on the witness stand at trial she testified her husband usually carried his wallet with him and she remembered him putting his wallet into his back pants pocket before they left for the movie. She said he usually kept his money and driver's license in his wallet. At the theater, Gutierrez paid for the tickets and purchased snacks and drinks. As they were leaving the movie theater, Gutierrez was shot and killed. A subsequent autopsy revealed he had been shot once in the back, twice in the back of his right shoulder, and once in the back of the head. The medical examiner's inventory of items taken from Gutierrez lists his necklace and watch, his cellular telephone, the movie tickets, small change, rolls of film, a key chain and keys, a pocket knife, and an automatic door opener. Although not on the list, Gutierrez's bracelet was later recovered. His wallet was not on the list, and neither the wallet nor its contents were ever recovered. Gutierrez's clothes were placed on the floor of the hospital morgue and later retrieved by the medical examiner's office and placed on a tray in the cooler to be examined by the medical examiner. The hospital's inventory of items also did not list the wallet.

■ Although the only evidence that Gutierrez had his wallet when the couple went to the Quarry Market came from

Karol's trial testimony, which varied from her deposition testimony, it was the jury's, and not this court's, province to determine her credibility on the witness stand. *See City of Keller v. Wilson,* 168 S.W.3d 802, 819 (Tex.2005). As a reviewing court, we must assume the jurors decided the question of Karol's credibility in favor of the verdict "if reasonable human beings could do so." *Id.* We conclude it would not be unreasonable for a jury to determine that Gutierrez had his wallet with him when the couple went to the movie.

■ It is also the province of the jury to draw from the evidence "whatever inferences they wish, so long as more than one is possible and the jury must not simply guess." *Id.* at 821. It is true there is no direct evidence that Gutierrez's wallet was taken in the course of a robbery that ended with his murder. However, we conclude a reasonable jury could have inferred that Gutierrez's wallet was stolen by the perpetrators and he died as the result of a robbery, as opposed to a retaliatory "hit" as argued by Trammell Crow. Karol testified he placed his wallet in his pants pocket before they went to the theater. The morgue inventory lists everything taken from Gutierrez's body (his necklace and watch) and his pockets (his cellular telephone, the movie tickets, small change, rolls of film, a key chain and keys, a pocket knife, and an automatic door opener). The wallet in which he kept his money is not listed and was never recovered. A reasonable inference is that the wallet was not in his pants pocket when his clothing was inventoried because it was stolen during the robbery/murder. "[C]ourts reviewing all the evidence in a light favorable to the verdict must assume jurors made all inferences in favor of their verdict if reasonable minds could, and disregard all other inferences in their legal sufficiency review."

*Id.* Thus, we disregard any inference that the wallet was not stolen in the course of Gutierrez's murder.

We next analyze Gutierrez's robbery and murder "within the context in which it occurred...." *Mellon Mortgage,* 5 S.W.3d at 657. Of the ten violent crimes occurring at the Quarry Market in the two years before the Gutierrez shooting, eight occurred between the hours of 6:00 p.m. and 6:00 a.m., most occurred during the Saturday to Monday period, and the average appears to be one violent crime every other month. Many of the crimes occurred as the victims were walking to or from a store or their vehicles. Such repeated violent crimes at a targeted shopping mall may increase the risk of violent personal crimes such as murder at the same location. *See Timberwalk,* 972 S.W.2d at 758. Gutierrez's murder occurred sometime after midnight on a Sunday as Gutierrez and his wife were walking from the movie theater to their car. Because his murder occurred at a time and place that injury to him might reasonably have been foreseen, Gutierrez was "within the range of [Trammell Crow's] apprehension that [his] injury was foreseeable." *Mellon Mortgage,* 5 S.W.3d at 657. Accordingly, we conclude it was foreseeable that Gutierrez, or a person similarly situated, could be murdered at the Quarry Market.

## CAUSATION

■ Trammell Crow next asserts the plaintiffs failed to show that any negligence on its part proximately caused Gutierrez's murder. Proximate cause is comprised of two elements: cause in fact and foreseeability. *Nixon v. Mr. Property Mgmt. Co., Inc.,* 690 S.W.2d 546, 549 (Tex. 1985). Because Gutierrez's murder was

foreseeable,[2] the last inquiry is whether Trammell Crow's acts or omissions were the cause in fact of Gutierrez's injury. "The test for cause in fact is whether the act or omission was a substantial factor in causing the injury without which the harm would not have occurred." *Western Inv., Inc. v. Urena*, 162 S.W.3d 547, 551 (Tex. 2005). "If the defendant's negligence merely furnished a condition that made the injuries possible, there can be no cause in fact." *Id.*

■ In February 2002, Trammell Crow employed off-duty San Antonio police officers who patrolled the property either by riding bicycles or by driving the property in their own private unmarked vehicles. Two of these officers testified that when they drove in their vehicles, they kept the driver's side window rolled down and their arm propped on the window so that their San Antonio Police Department uniform patch was visible. The vehicles had no designation identifying them as security and had no conspicuous lights. One of Trammell Crow's security officers stated he preferred to patrol in an unmarked vehicle, because "[t]hat way people can't—if they're breaking into a building, they don't know where I'm at."

One of the off-duty police officers testified that a private investigator hired by a woman whose purse was stolen earlier spoke with him ten days before the Gutierrez shooting; the officer in turn relayed the conversation to Shirley Scheer, a Trammell Crow property manager. According to the officer's testimony, he told Scheer that the woman had sent someone over to complain that security was not visible enough. Scheer's response was that bicycles were adequate and provided high visibility. On the night Gutierrez was murdered, Trammell Crow had three off-duty police officers on duty; none of whom were on bicycles. Two of the officers were stationed at the south end of the mall on a specific assignment to watch for store burglaries, leaving only a single officer to patrol the entire property in his unmarked car.

Plaintiffs' criminologist expert, Dr. George Kirkham, testified that the security system in place at the Quarry Market on the night Gutierrez was murdered violated acceptable professional security standards. He explained the difference between a "deterrent" security system and an "undercover" security system. According to Kirkham, an "undercover" security system, such as the one utilized by Trammell Crow, served to apprehend criminals only after the crime had been committed. On the other hand, Kirkham said a "deterrent" security system, such as Wal–Mart's use of golf cart-type vehicles with flashing lights in their store parking lots, prevented crime because security was conspicuous. Kirkham stated off-duty police officers were the best type of security because they were well-trained, armed, and knew the law. However, they were not conspicuous because the officers drove the Quarry Market parking lot in their private unmarked vehicles. Kirkham distinguished between law enforcement's function to catch criminals and private security's function to deter crime. Thus, according to Kirkham, while the off-duty officers may come upon someone committing a crime, their inconspicuous presence provided no deterrence, and deterrence is required in a shopping mall parking lot as large as that of the Quarry Market's.

---

2.  The foreseeability analysis is the same for duty and proximate cause. *Mellon Mortgage*, 5 S.W.3d at 659; *Garcia v. Cross*, 27 S.W.3d 152, 157 (Tex.App.–San Antonio 2000, no pet.).

Kirkham explained that private security in shopping malls, particularly in parking lots, should be conspicuous because it deters opportunist criminals. He said shopping mall parking lots are "hot spots" that require conspicuous security because customers are distracted as they walk to their cars with packages or leave their cars, locking up on their way into stores. Kirkham opined that, even if this was a targeted shooting, "[i]t would look to anyone as if there's no security around here. And, that's the problem.... Here, they were able to take their time after shooting, for whatever reason, take personal effects and so on. It indicates to me logically as a criminologist that they must not believe there's any security."

Trammell Crow's expert admitted the following:

> I think what I testified to is that if we would have had visible patrols—and here I'm talking about some kind of patrolling arrangement in the [sic] in the immediate vicinity of where this took place—I would like to think that, regardless of who the offender was, he [or] she would not have done it at that particular time. Now, he or she may have picked another time and place, like a drive-by at Mr. Gutierrez's home or somewhere else, but I would agree with you. If they had a fixed post guard, I don't think it would have happened right at that time. But it would have happened somewhere else.

On this record, we conclude Trammell Crow's inconspicuous "undercover" security system was a substantial factor in causing the death of Gutierrez at the Quarry Market. Thus, the plaintiffs established proximate cause and that Trammell Crow failed to act within the parameters of its duty.[3] *See Havner v. E–Z Mart Stores, Inc.*, 825 S.W.2d 456, 461–62 (Tex.1992) (concluding that although the precise circumstances of the murder would never be known, plaintiffs had introduced enough evidence for the jury to conclude that the store's inadequate security system was a cause of the victim's death).

### CONCLUSION

Accordingly, we overrule Trammell Crow's issues on appeal and affirm the trial court's judgment.

Dissenting opinion by SARAH B. DUNCAN, Justice; joined by KAREN ANGELINI, Justice and PHYLIS J. SPEEDLIN, Justice.

SARAH B. DUNCAN, Justice, dissenting.

The majority's imposition of a duty on Trammel Crow rests upon its conclusion that "there is no doubt" that nine robberies and one aggravated assault over a two-year period at a 53–acre shopping mall "are 'sufficiently similar' to Gutierrez's shooting" to render his murder foreseeable. Why? Because, the majority says, the nine robberies and one aggravated assault that preceded Gutierrez's murder "involved injury to a person or the threat of injury and occurred within two years of Gutierrez's murder." It is thus irrelevant to the majority's analysis that none of the previous "violent crimes" involved a shooting (much less an injury from a shooting), while Gutierrez's "shooting" in fact consist-

---

**3.** In a single sentence, Trammell Crow asserts the evidence is legally and factually insufficient to show that it failed to act within the parameters of its duty, if any, to Gutierrez. However, Trammell Crow makes no argument regarding any factual sufficiency and in its prayer for relief, Trammell Crow asks this court to render judgment in its favor. We therefore construe Trammell Crow's issues as a complaint regarding the legal sufficiency of the evidence.

ed of three shots in his back and one shot in the back of his head. Likewise irrelevant to the majority's analysis is the undisputed evidence that the chance of being a victim of any violent crime (much less a murder) at the Quarry Market during the two years preceding Gutierrez's death was 1,637,630 to 1. The majority's analysis appears to reject the Texas Supreme Court's analytical frameworks in *Timberwalk* and *City of Keller* and replace them with a rule of strict liability for premises owners. From the judgment that inevitably results, I cannot do other than dissent.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

While the San Antonio Police Department (SAPD) was investigating a series of "smash and grab" burglaries,[2] it received information that some of the stolen property from one of these burglaries was in the possession of Luis Gutierrez at the home he shared with his mother, Maria Gutierrez. Subsequently, Detective Eddie Gonzales and his partner Brad Sanders, assisted by several other officers, arrived at Mrs. Gutierrez's home to conduct a search. The officers parked their marked police cars in front of the home.

During the search, the officers recovered a watch bearing a serial number that matched one stolen in one of the "smash and grab" burglaries under investigation. When confronted, Gutierrez claimed he did not actually commit the burglary but was merely the "fence" for the operation. After the police officers afforded Gutierrez an opportunity to cooperate in exchange for their recommendation of a lighter sentence and "filing at large,"[3] Gutierrez provided information regarding the other participants in the burglary. Intending to charge Gutierrez with the receipt of stolen property after the serial number checks were completed, the police arrested Gutierrez on outstanding warrants arising out of traffic tickets "to get him into the system," handcuffed him, and took him to the police station. At the station, Gutierrez made a voluntary written statement naming his confederates. When Gutierrez was released, Sanders gave him a business card and told Gutierrez to page him if he had any other information. Within an hour after Gutierrez posted bond, he called Sanders's pager number and asked to be picked up outside the jail. At his subsequent visit to the station, Gutierrez provided further information regarding those participating in the burglary and expressed concern that one of his confederates had seen the marked police cars parked in front of his home during the search and another had been told of Gutierrez's arrest by his brother.

Approximately two or three weeks after Gutierrez's arrest, he again called the police wanting to talk. During this conversation, Gutierrez relayed that he had been receiving threatening messages from his confederates on his cell phone and was afraid of a drive-by shooting. He had recorded some of these phone messages and let Detective Gonzales listen to them. In one of these messages, the caller said: "If you didn't say anything ..., why are

1. In an effort to encourage others to follow suit, I would like to publicly express my sincere appreciation to the parties and their attorneys for providing this Court with a hyperlinked brief and electronic record. These tools have made the tasks of writing, cite-checking, and circulating this opinion far more efficient and, as a result, saved tremendous time and other limited resources.

2. In a "smash-and-grab" burglary, a person drives a truck through a plate glass window and steals merchandise.

3. When a case is "filed at large," the suspect is notified before the case is filed to give him an opportunity to make arrangements for an attorney and raise bail money.

you hiding? Quit being a little bitch. Come out and talk to us." Although Gonzales offered to park a patrol car in front of Mrs. Gutierrez's home, Gutierrez told the police that all he wanted was money to relocate so his mother would not be the victim of a shooting. Gutierrez said he could get himself out of his problems. But Gutierrez warned Gonzales that "[he] [didn't] know what [he'd] stumbled into." In response to the offer to meet somewhere other than the police station, Gutierrez said he was not that worried and would come to the station. Detective Gonzales thus did not get the impression Gutierrez thought his life was being threatened. After Gutierrez arrived at the station on Monday, February 11, 2002, the police gave him $250.

The following Sunday, February 17, at approximately 10:00 p.m., Gutierrez and his pregnant wife, Karol Ferman,[4] went to a late movie at the Regal Cinemas at the Quarry Market, a 53–acre shopping mall managed at the time by Trammell Crow Central Texas, Ltd. At approximately 12:20 or 12:30 a.m., as the couple exited the cinema and neared their car, Karol heard a shot. When she turned around, she saw the shooter, dressed in black with a black hood or ski mask over his face. Karol did not think the first shot hit anyone, but she thought the shooter's second shot hit Gutierrez in the shoulder. Gutierrez fell to the ground, then got up, and the couple started running towards the south end of the mall. Then Karol fell to the ground and, no longer able to move, got under a car. She never thought their assailant was shooting at her. A subsequent autopsy revealed Gutierrez had been shot once in the back, twice in the back of his right shoulder, and once in the back of the head. The SAPD classified Gutierrez's death as murder.

On March 28, 2002, Maria Gutierrez and Karol Ferman, individually and on behalf of her son, filed this lawsuit alleging Gutierrez's death was proximately caused by Trammell Crow's negligent failure to provide adequate security. The petition was later amended to add claims by Mrs. Gutierrez on behalf of Gutierrez's three minor children from a previous relationship. The jury returned a verdict in favor of the plaintiffs and awarded them $6,555,900 in damages. Due to a settlement credit, this amount was reduced in the final judgment to $5,341,998.

## DUTY

Trammell Crow argues that as a matter of law it owed no duty to Gutierrez. I agree.

### *Standard of Review*

"The existence of a duty is a question of law for the court to decide from the facts surrounding the occurrence in question." *Walker v. Harris*, 924 S.W.2d 375, 377 (Tex.1996). However, "evidence of specific previous crimes on or near the premises may raise a fact issue on the foreseeability of criminal activity." *Id.* This review must be conducted in light of the applicable law.

### *Applicable Law*

The parties agree the applicable law is set forth in *Timberwalk Apts., Partners, Inc. v. Cain*, 972 S.W.2d 749, 756 (Tex. 1998), in which the Supreme Court of Texas set forth the duty analysis to be employed in an invitee's suit for injuries arising out of the criminal acts of third parties:

---

**4.** Although Trammell Crow disputed at trial whether Ferman and Gutierrez were married, the jury found they were; and Trammell Crow does not challenge this finding on appeal.

As a rule, "a person has no legal duty to protect another from the criminal acts of a third person." An exception is that "[o]ne who controls ... premises does have a duty to use ordinary care to protect invitees from criminal acts of third parties if he knows or has reason to know of an unreasonable and foreseeable risk of harm to the invitee." .... "Foreseeability requires only that the general danger, not the exact sequence of events that produced the harm, be foreseeable." When the "general danger" is the risk of injury from criminal activity, the evidence must reveal "specific previous crimes on or near the premises" in order to establish foreseeability.

The foreseeability of an unreasonable risk of criminal conduct is a prerequisite to imposing a duty of care on a person who owns or controls premises to protect others on the property from the risk. Once this prerequisite is met, the parameters of the duty must still be determined.....

.... A duty exists only when the risk of criminal conduct is so great that it is both unreasonable and foreseeable. Whether such risk was foreseeable must not be determined in hindsight but rather in light of what the premises owner knew or should have known before the criminal act occurred. In determining whether the occurrence of certain criminal conduct on a landowner's property should have been foreseen, courts should consider whether any criminal conduct previously occurred on or near the property, how recently it occurred, how often it occurred, how similar the conduct was to the conduct on the property, and what publicity was given the occurrences to indicate that the landowner knew or should have known about them.

. . . .

These factors—proximity, recency, frequency, similarity, and publicity—must be considered together in determining whether criminal conduct was foreseeable. Thus, the frequency of previous crimes necessary to show foreseeability lessens as the similarity of the previous crimes to the incident at issue increases. The frequent occurrence of property crimes in the vicinity is not as indicative of foreseeability as the less frequent occurrence of personal crimes on the landowner's property itself. The court must weigh the evidence using all the factors.

*Timberwalk,* 972 S.W.2d at 756–57, 759 (citations omitted) (quoting *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996) and *Lefmark Mgmt. Co. v. Old,* 946 S.W.2d 52, 53 (Tex.1997)).

## THE EVIDENCE

Under *Timberwalk,* we must first review the evidence of the proximity, recency, frequency, similarity, and publicity of specific previous crimes at or near the Quarry Market.

### *Proximity and Publicity*

The record is devoid of evidence of crimes in the area surrounding the Quarry Market and of publicity as such. However, the purpose of reviewing publicity is to determine "whether a landowner knew or should have known of a foreseeable danger." *Timberwalk,* 972 S.W.2d at 758. Here the plaintiffs do not contend Trammell Crow should have known of unreported crimes; and it is undisputed that it knew of the reported crimes. Accordingly, our foreseeability analysis presumes knowledge and turns on the recency, frequency, and similarity of the reported crimes occurring at the Quarry Market.

### Similarity, Recency, and Frequency

The evidence conclusively establishes that, before Gutierrez's murder, the Quarry Market had never experienced a murder. Indeed, before Gutierrez's death, the Quarry Market had never experienced a shooting. Therefore, the plaintiffs sought to establish that Gutierrez's death occurred in the context of a robbery and offered evidence of robberies occurring at the Quarry Market from January 1, 2000 until February 18, 2002. However, the evidence of a robbery is at best thin.

Karol Ferman testified there was no prior demand for money or property and indeed no prior interaction with their assailant at all; the shooter simply started shooting. No one testified to having seen the shooter bending over Gutierrez or trying to take anything from him; and no one tried to take Karol's purse. Karol also testified that, when they arrived at the cinema, Gutierrez was wearing a necklace, bracelet, and watch; but the undisputed evidence establishes that all of these items were found either at the scene or on Gutierrez's body.[5] Also recovered at the hospital were Gutierrez's cell phone, 2 one dollar bills, five quarters, an exposed roll of film, two movie ticket stubs, a key chain with four keys, a pocket knife, and a garage door opener.

The only evidence that Gutierrez's death occurred in the context of a robbery is thus his missing wallet; and the evidence regarding the wallet is at best conflicting. In her deposition, Karol testified she was not sure whether Gutierrez had his wallet the night he was shot. By the time of trial, she was sure he did. But even if it were assumed Gutierrez had his wallet the night he was murdered, as Karol testified, that testimony does not establish that Gutierrez's wallet was stolen during a robbery; it may well have been stolen at the scene after he was murdered or later at the hospital.[6] " 'When the circumstances are equally consistent with either of two facts, neither fact may be inferred.' " *City of Keller v. Wilson*, 168 S.W.3d 802, 813 (Tex.2005) (quoting *Tubelite v. Risica & Sons, Inc.*, 819 S.W.2d 801, 805 (Tex. 1991)); *see also City of Keller*, 168 S.W.3d at 814 ("[W]hen injury or death occurs without eyewitnesses and only meager circumstantial evidence suggests what happened, we cannot disregard other meager evidence of equally likely causes."). The majority has not identified and I have not found anything in the record to make the fact the plaintiffs urge—Gutierrez's wallet was stolen by the shooter during the course of a robbery—any more plausible than any other possibility, including the fact Trammell Crow argues—Gutierrez was murdered in a retaliatory hit by his confederates. Indeed, if either inference is more plausible, it is that Gutierrez was murdered in a retaliatory hit. A retaliatory hit is consistent not only with the manner of Gutierrez's death (without a demand for money or property and three shots in the back and one in the back of the head) but also with its timing (shortly after he gave his confederates' names to the police and was known by his confederates to have been arrested, shortly after he received threatening messages on his cell phone from his confederates, and one week after

---

5. Appellees argue Gutierrez was also robbed of his bracelet. However, the undisputed testimony of an SAPD property room employee, Anthony Weaver, and the property room's records established that the bracelet was recovered at the scene and had been stored as evidence in the SAPD property room.

6. According to the records of the Bexar County Forensic Science Center, a hospital employee reported that, when Gutierrez's body was picked up, his clothing was left on the morgue floor and only later recovered by an employee of the medical examiner's office.

he took $250 from the police to relocate to avoid his mother being harmed in a drive-by shooting). Nonetheless, I agree with the majority that we should review the plaintiffs' evidence of specific crimes at the Quarry Market from January 1, 2000 through February 18, 2002.

During the two years preceding Gutierrez's death, the Quarry Market was the stage for four aggravated robberies and six robberies. These "violent crimes" [7] can be more specifically described as follows:

1. Wednesday, March 29, 2000 at 6:40 p.m.—As a woman exited a store, a man grabbed her purse. She pulled back; but he pushed her, took her purse, ran off, and got into a waiting vehicle. When a witness tried to block the suspect with her vehicle, he rammed her car and fled. This crime was classified by the SAPD as "robbery."

2. Monday, April 17, 2000 at 12:30 a.m.—As a man was exiting the cinema, two men asked if he was "some big shot" and followed the man back into the cinema. The two suspects then began to hit the man, knocking him down, and reached into his pocket and took his money, credit cards, necklace, and military ID.[8] This crime was classified by the SAPD as a "robbery-bodily injury."

3. Sunday, May 7, 2000 at 1:10 a.m.—As a man was walking from a store to his vehicle, two people in a passing car first asked for directions and then said, that if he did not want to die, he should give them his wallet. When the man said he did not have a wallet, the people in the car asked him for his pager, cellular telephone, and keys. While the man relinquished these items, one of the suspects pointed an unknown object covered by a black trash bag. This crime was classified by the SAPD as "robbery-deadly weapon."

4. Saturday, May 20, 2000 at 6:53 p.m.—A suspect entered a store, told an employee he had a heat-activated hand grenade, and demanded money. The employee complied, turning over approximately $750. The purported hand grenade was found to be "simulated" or fake. This crime was classified by the SAPD as "aggravated robbery."

5. Monday, December 18, 2000 at 7:24 p.m.—While seated inside a restaurant, a woman's purse was stolen. When she pursued the purse snatcher into the parking lot, he pushed her away, jumped into the passenger side of a waiting vehicle, and sped away. This crime was classified by the SAPD as "robbery-bodily injury."

6. Monday, December 20, 2000 at 7:35 p.m.—A suspect entered a store containing a bank and presented the teller a handwritten note, which reportedly stated that it was a robbery and the teller should not move or he would be killed and demanded the money in the top drawer. The suspect then handed the teller a large manilla envelope and told the teller to put the note and the money in the top and bottom drawers in the envelope. This crime was classified by the SAPD as "robbery."

7. Monday, July 9, 2001 at 9:44 p.m.—As a man was sitting in his car with his girlfriend, a suspect tapped on his window with a gun, told the man he needed his vehicle, gave the man time to remove his belongings from the car, and then took the car. This crime was clas-

---

7. The experts agreed that the following are "violent crimes": murder, rape, robbery, and aggravated assault.

8. Appellees argue the man was "pistol-whipped." However, the police report makes no mention of a weapon or pistol-whipping.

sified by the SAPD as "aggravated robbery-deadly weapon."

8. Monday, October 22, 2001 at 11:45 p.m.—As a woman and her companion were walking in the parking lot, they noticed a man standing in front of a parked car. The man approached them and asked for the time. The woman gave the man the time; and the two continued walking. The man then demanded their money. As they continued walking, the driver in the parked car stepped out of the car and pointed a gun that looked to them like an Uzi and told the woman to give him their money or he would kill them. The first man then grabbed the woman's purse, got into the car, and fled with the other man. This crime was classified by the SAPD as "aggravated robbery-deadly weapon."

9. Sunday, January 13, 2002 at 5:48 p.m.—As a woman started to open her car door, she was robbed of her purse at gunpoint. This crime was classified by the SAPD as "aggravated robbery-deadly weapon."

10. Thursday, January 24, 2002 at 2:05 p.m.—When a store manager chased a shoplifting suspect out into the parking lot to get the suspect's license plate number, the suspect fled the scene in his vehicle, striking the manager's left elbow with the driver's side mirror and causing the manager to spin and fall. This crime was classified by the SAPD as "robbery-bodily injury."

There was thus only one robbery that occurred in the early morning hours of a Monday morning and that robbery occurred almost two years before Gutierrez's murder (# 2). There were three that definitely involved a gun (# 7, 8, 9) and one that may have involved a gun (# 3). None of these robberies involved a shooting or a death. Indeed, the bodily injuries that resulted from these robberies were minimal—two women were pushed (# 1 and 5); one man was hit and knocked down (# 2); and another man's left elbow was hit by a vehicle's side mirror (# 10). There were also two robberies inside mall stores; but the plaintiffs' expert admitted these robberies were not relevant to the issues in this suit. In addition to these "violent crimes," people coming to the Quarry Market experienced 166 "property crimes": fourteen burglaries, 132 thefts, and twenty auto thefts. The next step in the analysis should be to "weigh the evidence using all the factors." *Timberwalk*, 972 S.W.2d at 759.

## WEIGHING THE EVIDENCE

With 166 "property crimes" (fourteen burglaries, 132 thefts, and twenty auto thefts) in the two-year period preceding Gutierrez's murder, it is clear that property crimes at the Quarry Market were foreseeable. However, "[t]he frequent occurrence of property crimes in the vicinity is not as indicative of foreseeability as the less frequent occurrence of personal crimes on the landowner's property itself." *Id.* The analysis should therefore return to the recency, frequency, and similarity of *violent* personal crimes at the Quarry Market, keeping in mind that "the frequency of previous crimes necessary to show foreseeability lessens as the similarity of the previous crimes to the incident at issue increases." *Id.*

If I were to assume Gutierrez's murder occurred in the context of a parking lot robbery—an assumption that I believe is frankly speculative—the Quarry Market in the two years before Gutierrez's death had experienced six other parking lot robberies. None was remotely similar. None involved a murder or even a shooting. Indeed, only five of the six involved any physical contact between the robber and victim at all; and this contact arose out of

the victims' efforts to recover their stolen property. The sixth—the crime most similar to that involving Gutierrez—was the attack on the man exiting the cinema twenty-two months earlier on Monday, April 17, 2000 at 12:30 a.m. (# 2 above). Both crimes occurred near the theater in the early morning hours of a Monday. But the similarities end there. The robbers on April 17 began the altercation verbally, asking the man if he thought he was "some kind of big shot," while Gutierrez's attacker said nothing; he simply started shooting. The robbers in the April 17 altercation hit their victim, knocking him to the ground, while Gutierrez was knocked to the ground by three shots in the back and one in the back of the head. The robbers in the April 17 altercation reached into their victim's pocket and took his money, credit cards, necklace, and military ID, while Gutierrez's attacker at best took his wallet, leaving behind his necklace, bracelet, watch, cell phone, 2 one dollar bills, five quarters, an exposed roll of film, two movie tickets, a key chain with four keys, a pocket knife, and a garage door opener. And no one—including Karol Ferman—testified that the shooter bent over Gutierrez or tried to take anything from him. Not surprisingly, the SAPD classified the April 17 altercation a robbery, while it classified that involving Gutierrez a murder. In short, the April 17 altercation occurred twenty-two months before Gutierrez's murder and was only marginally similar. It simply cannot be said that violent crime of the sort that ended in Gutierrez's murder was frequent at the Quarry Market. This conclusion is borne out by the testimony of one of Trammell Crow's experts, security consultant William Bieck, who assessed the "violent crime rate" or risk of victimization in the City of San Antonio and at the Quarry Market. The plaintiffs insist we may not consider this evidence for two reasons:

Pickard testified that "comparing a city's crime rate to a specific location's crime rate is like comparing apples to oranges;" and to consider Bieck's testimony would contravene the standard of review. I disagree with both arguments.

Pickard testified that he created the Houston Crime Index using police department records to determine the number of violent and property crimes that occurred in each of the City's census tracts, assigning a value to each type of crime, and then rating the census tracts as low, below average, average, above average, and high in crime "to give the average person information on where they live and the crime." Pickard then testified as follows:

On the Houston Crime Index, . . . we disregard population. And there's a reason for that, and the jury needs to know. When the FBI security experts compare cities to cities, they compare crimes per city. We all know that at 8:00 in the morning, our neighborhood goes to work. When you try to compare one particular place to another, other than city to city, you've got mobile people running around. When we put our index together, we ran into the same problem, with experts telling us you can't do that or you can't do this. We made it real simple. We just added the number of crimes up that were in the census track. That was it; that's all we did was just added it up, from the highest and the lowest. Once we got the median range, everything was either above that or below that. Very easy.

However, Pickard agreed on cross-examination that a population count of the Quarry Market could be performed and a crime rate calculated and that rate could be compared to the crime rate for the City of San Antonio; he simply had not performed that work. At no point did Pickard testify that to compare the crime rate for the City

of San Antonio and the Quarry Mall would be "like comparing apples to oranges," as the appellees argue, or illegitimate in any other way. And this Court's task, unlike Pickard's in compiling the Houston Crime Index, is not to make the statistics "real simple" "for the average person"; rather, it is to make the statistics meaningful so that we may determine whether "[t]he occurrence of a significant number of crimes within a short period of time strengthens the claim that the particular crime at issue was foreseeable." *Timberwalk,* 972 S.W.2d at 758. Whether the number of crimes in a given area is "significant" logically entails consideration of the area's population. What might be considered a "significant" number of robberies in a ten-unit apartment complex might be less so in a complex with one thousand units. Indeed, the concept of "population" is virtually implicit in the definition of "frequent," which considers not only the number of times an event occurs but the intervals at which the event occurs. *See* WEBSTER's NINTH NEW COLLEGIATE DICTIONARY 492 (Merriam Webster, Inc.1984) (defining "frequent" as "common," "usual," "happening at short intervals"). I therefore conclude that Pickard's testimony does not preclude consideration of Bieck's testimony. Nor does the standard of review.

Citing *Timberwalk,* 972 S.W.2d at 752, Trammell Crow asserts that the supreme court "clearly condoned this type of evidence when it considered similar evidence comparing different rates of crime. . . ." However, the court's discussion on page 752 comparing the rate of sexual assault in Houston with the rate of sexual assault at Timberwalk Apartments occurs not in the court's analysis but in the court's statement of the factual and procedural background of the case. *See id.* (noting that in

the year preceding the assault "sexual assault occurred in Houston 0.72 times per 1,000 people," while "the year before that, the rate of occurrence in Timberwalk's census tract was 0.58 sexual assaults per 1,000 people, while the statewide rate was only slightly lower, 0.534 per 1,000 people"). But the El Paso Court of Appeals has considered—in the *Timberwalk* context—a defense expert's testimony regarding the crime rate. *See Jai Jalaram Lodging Group, L.L.C. v. Leribeus,* No. 08–04–00192-CV, 2006 WL 304496, at * 6 n. 4, —— S.W.3d —— & accompanying text (Tex.App.-El Paso Feb. 9, 2006, pet. denied) (considering the testimony of defendant's expert witness that the crime rate for the town in which the assault at issue occurred was "about 3.2 per 1,000 persons," while "the crime rate for Houston was about 11 per 1,000, with the national average at between 5 and 6 per 1,000)." I see no reason not to follow the El Paso Court's lead. Indeed, it seems to me nonsensical to disregard—in the *Timberwalk* context—undisputed expert testimony that quantifies the risk of victimization. *See Timberwalk,* 972 S.W.2d at 756 ("A duty exists only when the risk of criminal conduct is so great that it is both unreasonable and foreseeable.").

To arrive at the City of San Antonio's "violent crime rate," Bieck divided the total number of violent crimes by the population. Using this methodology, he calculated the City's violent crime rate in 2000 to be 6.63 and 8.15 in 2001. To arrive at a "population" for the Quarry Market, Bieck had a traffic count performed from Sunday, June 8, 2003 through Saturday, June 14, 2003 and determined that 143,869 vehicles entered and exited the Quarry Market during the seven-day period.[9] Multiplying

9. Due to the dates the traffic count was performed, Bieck's estimated population for the

Quarry Market did not include pedestrian traffic, "tax relief" shopping days, or the

this number by fifty-two yields the number of vehicles entering and exiting the Quarry Market during a one-year period: 7,481,-188. Using the industry average of 2.4–2.5 persons per vehicle would yield a population for the Quarry Market of 18,754,-351.78. However, Bieck conservatively assumed each vehicle contained only one person. Bieck then divided the number of persons (7,481,188) by the number of days in a year (365) to arrive at the Quarry Market's average daily population: 20,-496.40547.

Once Bieck had this "average daily population" for the Quarry Market, he performed the same analysis he had applied to the City of San Antonio to determine the Quarry Market's rate of violent crime during the two years preceding Gutierrez's murder. These computations revealed that the violent crime rate at the Quarry Market was .03 in 2000 and .01 in 2001 and 2002 for the Quarry Market (compared to the City's violent crime rate of 6.63 in 2000 and 8.15 in 2001). In other words, Bieck testified, while the chance of being a victim of violent crime in the City of San Antonio in the year 2001 was 44,760 to one, the chance of being a victim of violent crime at the Quarry Market during the two-year period preceding Gutierrez's murder was 1,637,630 to one.

Because violent crime of the sort that caused Gutierrez's murder was so infrequent and so unprecedented in character at the Quarry Market, I would hold Gutierrez's murder was not foreseeable as a matter of law. *See and compare Walker v. Harris*, 924 S.W.2d 375, 377–78 (Tex. 1996) (holding that stabbing death was not foreseeable when other crimes on premises were domestic or neighbor disturbances,

vandalism, and theft from vacant apartment); *Tex. Real Estate Holdings, Inc. v. Quach*, 95 S.W.3d 395, 400 (Tex.App.-Houston [1st Dist.] 2002, pet. denied) (holding that violent car jacking in which plaintiff was shot was not foreseeable when, in previous two years, premises had experienced no other reports of "stranger-initiated" [10] violent crime involving injuries but only an assault between relatives, three auto thefts, and five thefts from vehicles); *Ramirez v. AHP Mut. Hous. Ass'n, Inc.*, No. 14–04–00159–CV, 2005 WL 425486, at *2 (Tex.App.-Houston [14th Dist.] Feb. 24, 2005, no pet.) (mem.op.) (holding stabbing incident was not foreseeable as a matter of law because other reported crimes were not "even close to being as violent or as serious as the attack on Ramirez") (citing *Harris* and *Quach*).

## CONCLUSION

Because Gutierrez's murder was not foreseeable as a matter of law, Trammell Crow owed no duty to take steps to prevent it. Accordingly, I would reverse the trial court's judgment and render a take-nothing judgment. Because the majority instead affirms, I respectfully dissent.

---

Thanksgiving and Christmas holidays, which usually account for two-thirds to three-fourths of retail sales.

10. *See Dickinson Arms–Reo, L.P. v. Campbell*, 35 S.W.3d 633, 634 (Tex.2000) (Hecht, J., joined by Owen, J., dissenting from denial of petition for review).