**Rose BARTON, Individually and as Personal Representative of the Estate of Christopher Martin Dean, Appellant,**

v.

**WHATABURGER, INC., Appellee.**

No. 01–06–01121–CV.

Court of Appeals of Texas, Houston (1st Dist.).

July 31, 2008.

Order Denying Rehearing En Banc Feb. 13, 2009.

Carl V. Crow, Carl V. Crow, P.L.L.C., Russell S. Post, David M. Gunn, Beck, Redden & Secrest, LLP, Houston, TX, for Appellant.

Hubert A. Crouch III, Court Dean Smith, Crouch & Ramey, LLP, Dallas, TX, Raul A. Gonzalez Jr., Law Office of Raul A. Gonzalez, Austin, TX, Frank Gerhardt Cawley, Whitehurst & Cawley, L.L.P., Addison, TX, for Appellee.

Panel consists of Chief Justice RADACK and Justices ALCALA and BLAND.

## OPINION

JANE BLAND, Justice.

This negligence case arises from the aggravated robbery of a Whataburger restaurant and the resulting murder of one of its employees on duty during the robbery.

Rose Barton, individually and on behalf of the estate of her son, Christopher Dean, the Whataburger employee who was murdered, appeals the trial court's summary judgment entered in favor of Whataburger, Inc. Barton contends that the trial court erred in granting summary judgment on her claim that Whataburger was negligent in (1) hiring Gregory Love to manage its restaurant, as he conspired to commit the robbery that led to the murder; (2) failing to provide a safe workplace for Dean; and (3) failing to exercise reasonable care to prevent the robbery. We conclude that the trial court properly granted summary judgment because the aggravated robbery leading to murder was not foreseeable as a matter of law.

### Background

On a night in May 2003, Love was working as a night manager at a Whataburger restaurant in northwest Houston. Also on duty that night was Dean, a mentally impaired employee who had worked for Whataburger for fourteen years. Love arrived early for his shift that evening, allowing Arthur Murray, another manager, to leave. Murray and Love agreed that Love would count the cash that had accumulated in the registers during Murray's shift and place it in the store safe.

Shortly after Murray left the Whataburger, Love called Murray and told him that he also needed to leave work. Love asked Murray if he could leave Dean in charge of the restaurant. Murray responded that Dean was capable of running the restaurant, but he could not authorize Love to delegate his managerial power to Dean.

Love did not ask Murray to return, and instead disregarded Murray's warnings, left the restaurant, and put Dean in charge. Love did not count the money in the cash registers or deposit any money in the safe before he left. When Dean discovered that Love had not counted the money in the registers, he counted it and deposited the excess in the safe. Love never returned to the restaurant that night.

At around 4:00 a.m., three men, later identified as Gerald Marshall, Ronald Worthy, and Kenny Calliham, attempted to rob the Whataburger. Marshall gained access to the interior of the restaurant by climbing through the drive-through window. Marshall chased Dean, eventually into the back of the restaurant, where he demanded that Dean give him the key to the safe. Marshall told Dean that if Dean did not give him the key to the safe, Marshall would shoot him. Dean repeatedly told Marshall that he did not have a key to the safe and could not comply with Marshall's demands. When Dean failed to produce the key, Marshall shot him in the face and fled the scene with Worthy and Calliham. Dean died immediately. The robbers left with nothing, but afterward robbed a Shipley Doughnut store equipped with video surveillance.

Police later connected Love to the robbery, and the State charged him with capital felony murder under the law of parties. *Love v. State*, 199 S.W.3d 447, 449, 452 (Tex.App.–Houston [1st Dist.] 2006, pet. ref'd). A jury found Love guilty, and the trial court assessed punishment at life in prison. *Id.* at 449. Our court affirmed the conviction. *Id.*

Barton sued Whataburger under the Texas wrongful death statute, asserting that Whataburger's negligence proximately caused Dean's death. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 71.002(a)-(b), 71.004(a) (Vernon 2008). Whataburger moved for a no-evidence summary judgment on Barton's negligence claim, asserting that Barton had produced no evidence of duty, breach, or proximate cause. The

trial court granted a final summary judgment in favor of Whataburger.

## Analysis

### Standard of Review

In a Rule 166a(i) no-evidence summary judgment, the movant represents that no evidence exists as to one or more essential elements of the non-movant's claims, upon which the non-movant has the burden of proof at trial. Tex.R. Civ. P. 166a(i). The non-movant then must present evidence raising a genuine issue of material fact on the challenged elements. *Id.* A no-evidence summary judgment is essentially a pre-trial directed verdict. *Bendigo v. City of Houston*, 178 S.W.3d 112, 113–14 (Tex. App.–Houston [1st Dist.] 2005, no pet.). A fact issue exists if the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex.2003) (quoting *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997)). If the evidence does no more than create a mere surmise or suspicion of fact, less than a scintilla of evidence exists, and summary judgment is proper. *Transp. Ins. Co. v. Faircloth*, 898 S.W.2d 269, 282 (Tex.1995); *Macias v. Fiesta Mart, Inc.*, 988 S.W.2d 316, 317 (Tex.App.–Houston [1st Dist.] 1999, no pet.). A respondent is not required to marshal its proof to defeat a no-evidence motion for summary judgment; she need only point out evidence that raises a fact issue on the challenged elements. Tex.R. Civ. P. 166a(i) cmt. (1997).

Because the trial court's summary judgment does not specify the ground on which the court relied for its ruling, we should affirm it if any theory advanced by Whataburger has merit. *See Weiner v. Wasson*, 900 S.W.2d 316, 317 n. 2 (Tex.1995).

### Nonsubscribers and Negligence

■ Whataburger is a nonsubscriber to the Texas Workers' Compensation Act. *See* Tex. Lab.Code Ann. § 406.002(a) (Vernon 2006) ("Except for public employers and as otherwise provided by law, an employer may elect to obtain workers' compensation insurance coverage."). "In an action ... against an employer who does not have workers' compensation insurance coverage, the plaintiff must prove negligence of the employer or of an agent or servant of the employer acting within the general scope of the agent's or servant's employment." *Id.* § 406.033(d) (Vernon 2006). Contributory negligence is not a defense in nonsubcriber cases. *Id.* § 406.033(a)(1); *Kroger Co. v. Keng*, 23 S.W.3d 347, 352 (Tex.2000).

■ A negligence cause of action has four elements: (1) a legal duty owed by one person to another, (2) a breach of that duty, and (3) damages (4) proximately caused by the breach. *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex.2002). In the context of the employer-employee relationship, a company has a duty (1) to provide rules for the safety of employees, and to warn them of reasonably foreseeable hazards; (2) to furnish reasonably safe machinery and equipment; (3) to furnish a reasonably safe place to work; and (4) to exercise ordinary care to select careful and competent fellow employees. *Fort Worth Elevators Co. v. Russell*, 123 Tex. 128, 135–36, 70 S.W.2d 397, 401 (1934); *see also Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex.2006); *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 186 n. 45 (Tex. 2004). An employer, however, is not an insurer of its employees' safety. *Elwood*, 197 S.W.3d at 794; *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex.1996); *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex.1993).

Whataburger does not dispute that it owed a duty to Dean, as its employee, but observes that its duty is to protect its

employees from foreseeable harms. The issue in this case, whether analyzed as a part of the duty element of negligence or the causation element, is the foreseeability of the criminal conduct that led to Dean's murder. As the Texas cases that discuss the foreseeability of intervening criminal conduct do so, in the main, in the context of the element of duty, we do so as well. *See, e.g., Timberwalk Apartments, Partners, Inc. v. Cain,* 972 S.W.2d 749, 756 (Tex.1998) (holding no legal duty exists to prevent unforeseeable criminal acts); *Walker v. Harris,* 924 S.W.2d 375, 377 (Tex.1996) (holding that duty to protect from criminal acts "does not arise in the absence of a foreseeable risk of harm"); *Houser v. Smith,* 968 S.W.2d 542, 544–45 (Tex.App.–Austin 1998, no pet.) (in negligent hiring case, holding that employer had no duty to prevent unforeseeable criminal conduct of employee); *cf. Doe v. Boys Clubs of Greater Dallas, Inc.,* 907 S.W.2d 472, 478 (Tex.1995) (in intervening criminal conduct case, holding that plaintiffs failed to raise fact issues on key elements of each of their claims, particularly on elements of proximate and producing cause).

*Duty and Intervening Criminal Conduct*

The threshold inquiry in a negligence case is duty. *Centeq Realty, Inc. v. Siegler,* 899 S.W.2d 195, 197 (Tex.1995). The existence of duty is a question of law for a court to decide from the facts surrounding the occurrence in question. *Van Horn v. Chambers,* 970 S.W.2d 542, 544 (Tex.1998); *Siegler,* 899 S.W.2d at 197; *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1990). In determining the scope of a defendant's duty, we consider the foreseeability of injury weighed against the magnitude of the burden of guarding against the injury and the consequences of placing the burden on the defendant. *See Otis Eng'g Corp. v. Clark,* 668 S.W.2d 307, 309 (Tex.1983).

As a general rule, "a person has no legal duty to protect another from the criminal acts of a third person." *Timberwalk,* 972 S.W.2d at 756. This is because the criminal conduct of a third party is a superseding cause that extinguishes any liability of the previous actor. *See Phan Son Van v. Pena,* 990 S.W.2d 751, 753 (Tex.1999); *Nixon v. Mr. Prop. Mgmt. Co., Inc.,* 690 S.W.2d 546, 550 (Tex.1985); *Garcia v. El Paso Ltd. P'ship,* 203 S.W.3d 432, 436 (Tex.App.–El Paso 2006, no pet.); *Cowart v. Kmart Corp.,* 20 S.W.3d 779, 783 (Tex.App.–Dallas 2000, pet. denied). However, if a criminal's conduct is a foreseeable result of the prior negligence of a party, the criminal act may not excuse that party's liability. *See Pena,* 990 S.W.2d at 753; *Nixon,* 690 S.W.2d at 550; *Cowart,* 20 S.W.3d at 783. To impose liability on a defendant for negligence in failing to prevent the criminal conduct of another, the facts must show more than conduct that creates an opportunity to commit crime— they must show both that the defendant committed negligent acts and that it knew or should have known that, because of its acts, the crime (or one like it) might occur. This legal principle is imparted in the Restatement (Second) of Torts, which states:

> The act of a third person in committing an intentional tort or crime is a superseding cause of harm to another resulting therefrom, although the actor's negligent conduct created a situation which afforded an opportunity to the third person to commit such a tort or crime, unless the actor at the time of his negligent conduct realized or should have realized the likelihood that such a situation might be created, and that a third person might avail himself of the opportunity to commit such a tort or crime.

Restatement (Second) of Torts § 448 (1965); *see also Pena,* 990 S.W.2d at 753;

*Humble Oil & Ref. Co. v. Whitten,* 427 S.W.2d 313, 315 (Tex.1968) (discussing Restatement (Second) of Torts § 442, which identifies factors to be considered in determining whether intervening force rises to level of superseding cause).

Thus, to impose a legal duty to prevent the criminal conduct of another, the crime must have been reasonably foreseeable at the time the defendant engaged in negligent conduct. Foreseeability exists if the actor, as a person of ordinary intelligence, should have anticipated the dangers his negligent act creates for others. *D. Houston,* 92 S.W.3d at 454. A danger is foreseeable if its general character might reasonably be anticipated, if not its precise manner. *Travis v. City of Mesquite,* 830 S.W.2d 94, 98 (Tex.1992); *Nixon,* 690 S.W.2d at 551. The question involves a practical inquiry, based on common experience applied to human conduct, and asks whether the injury might reasonably have been contemplated as a result of the defendant's conduct. *Doe,* 907 S.W.2d at 478. Importantly, "[f]oreseeability requires more than someone, viewing the facts in retrospect, theorizing an extraordinary sequence of events whereby the defendant's conduct brings about the injury." *Id.* Under the Texas Supreme Court's jurisprudence, we examine whether Barton raises facts that could lead a reasonable juror to conclude that Whataburger should have anticipated the criminal danger created by its alleged negligence. *See id.*

*Negligent Hiring*

Barton first contends that Whataburger's negligence in hiring Love as a restaurant manager caused the aggravated robbery that led to Dean's murder. Although no copy of the actual conviction and judgment appears in this record, Barton produced evidence of an investigative report that states that, in September 1993, Love was convicted of a felony offense of "dealing cocaine" in Indiana, and served one year in jail. Deposition testimony also indicates that a report exists that, nine years later, Love was convicted of felony nonpayment of child support in Texas, in November 2002, the week before he applied for a managerial position at Whataburger.[1] Whataburger performed a background check on Love before hiring him, but only searched for criminal convictions in Harris County that occurred between November 1995 and November 2002. The search did not reveal either of the two felony convictions. Barton alleges that Whataburger's failure to conduct an adequate background check ultimately caused the aggravated robbery that led to Dean's murder.

While Love's convictions, if discovered, should have raised Whataburger's suspicions about his fitness to manage a restaurant, under Texas law, they did not make his eventual participation in an aggravated robbery leading to murder reasonably foreseeable. *See Houser v. Smith,* 968 S.W.2d 542, 545 (Tex.App.– Austin 1998, no pet.) ("[w]hether [defendant] would have fired [the criminal actor] had he discovered ... forgery convictions is irrelevant ... the question presented is whether ... criminal conduct and the type

---

1. None of the Indiana or Texas criminal court records, or copies of Love's convictions, are part of the record in this case. A "possible matching record" internet report states that Love was convicted of an offense for "dealing-coke/narcotics," and that he was sentenced to two years, five months, and four days. The report provides no further information about the nature of the offense. The record also shows that one of Love's previous employers, Taco Bell, fired him for falsifying his employment application after the conviction came to light. Love similarly falsely stated on his application to Whataburger that he had never been convicted of a felony.

of harm that befell [plaintiff] were foreseeable and presented a risk that [defendant] was required to guard against.... Under these facts, we hold the conduct and harm were not foreseeable...."). Even assuming that information about Love's prior convictions, if known, would have torpedoed Love's employment with Whataburger, his criminal acts of selling cocaine and failing to pay child support are different from an aggravated robbery—neither crime inherently requires violence or theft, the two essential ingredients of an aggravated robbery. *See* TEX. PENAL CODE ANN. § 29.03 (Vernon 2003) (defining aggravated robbery as robbery in which person either causes serious bodily injury or uses or exhibits deadly weapon) and § 29.02 (defining robbery as theft coupled with bodily injury or threat of imminent bodily injury or death). The record contains no evidence that the events underlying either of Love's convictions involved violence or theft, or that Love engaged in any conduct during the seven months he was employed at Whataburger that would have made his participation in an aggravated robbery foreseeable. Even viewed in hindsight, Love's convictions for selling cocaine and nonpayment of child support do not indicate a propensity for violent criminal conduct, like aggravated robbery and murder. Thus, we hold that Love's own criminal behavior, and that of his cohorts, is a superseding cause that precludes Whataburger's liability for these crimes. *Compare Fifth Club, Inc. v. Ramirez,* 196 S.W.3d 788, 796–97 (Tex.2006) (holding that employee's failure to comply with requirement in peace officer manual and his reprimand for using profanity to member of public did not make his assault of customer foreseeable), *Doe,* 907 S.W.2d at 478 (holding that employee's two DWI convictions did not make his sexual assault foreseeable), *Houser,* 968 S.W.2d at 545 (holding that mechanic's three prior forgery convictions did not present foreseeable risk that he would commit sexual assault), *and Frith v. Fairview Baptist Church,* No. 05–01–01605–CV, 2002 WL 1565664, at *1, *4 (Tex.App.–Dallas July 17, 2002, pet. denied) (mem. op.) (holding that employee's convictions for burglary, possession of controlled substance, public intoxication, possession of marijuana, unlawful carrying of weapon, and evading arrest did not make his sexual assault of child foreseeable) *with Read v. Scott Fetzer Co.,* 990 S.W.2d 732, 734, 737 (Tex.1998) (holding that employee's deferred adjudication for indecency with child could make sexual assault of customer foreseeable when sales were made in customers' homes), *and Deerings W. Nursing Ctr. v. Scott,* 787 S.W.2d 494, 496 (Tex.App.–El Paso 1990, writ denied) (holding that nurse's fifty-six prior convictions for theft made his assault on elderly female visitor foreseeable).

In her appellate brief, Barton calls our attention to criminal cases that note the connection between drugs and violence. *See, e.g., Harmelin v. Mich.,* 501 U.S. 957, 1002, 111 S.Ct. 2680, 2706, 115 L.Ed.2d 836 (1991) (Kennedy, J., concurring) (upholding life sentence for possession of 650 grams of cocaine against Eighth Amendment challenge, noting that "Petitioner's suggestion that his crime was nonviolent and victimless ... is false to the point of absurdity. To the contrary, petitioner's crime threatened to cause grave harm to society."); *United States v. Brown,* 188 F.3d 860, 865 (7th Cir.1999) ("Drug dealing is a 'crime infused with violence.'" (quoting *United States v. Gambrell,* 178 F.3d 927, 929 (7th Cir.1999))); *United States v. Brown,* 913 F.2d 570, 572 (8th Cir.1990) ("Since weapons and violence are frequently associated with drug transactions, the officers reasonably believed that the individuals with whom they were dealing were armed and dangerous."); *United States v.*

*Trullo,* 809 F.2d 108, 113 (1st Cir.1987) ("In the instant case, the officer suspected appellant of dealing in narcotics, a pattern of criminal conduct rife with deadly weapons."); *United States v. Post,* 607 F.2d 847, 851 (9th Cir.1979) ("It is not unreasonable to suspect that a dealer in narcotics might be armed."); *United States v. Oates,* 560 F.2d 45, 62 (2d Cir.1977) ("Indeed, even apart from the agent's personal experiences, we have recognized that to 'substantial dealers in narcotics' firearms are as much 'tools of the trade' as are most commonly recognized articles of narcotics paraphernalia." (quoting *United States v. Wiener,* 534 F.2d 15, 18 (2d Cir.1976))); *Carmouche v. State,* 10 S.W.3d 323, 330 (Tex.Crim.App.2000) ("In the instant case, Largent stopped appellant pursuant to an articulable suspicion that appellant was trafficking in cocaine. Based on this limited knowledge of appellant's suspected activities, the officers justifiably approached appellant with caution. It was not unreasonable to conduct a limited search for weapons in these circumstances."); *Lemons v. State,* 135 S.W.3d 878, 884 (Tex. App.–Houston [1st Dist.] 2004, no pet.) ("McGann testified that, as a result of his experience and training, when he is involved in narcotics situations, he conducts pat-downs to check for weapons because there is a greater chance of weapons being present."). These decisions in criminal cases address the constitutionality of a *Terry* stop by a police officer, or of severe punishment for possession of large quantities of drugs.

We acknowledge that courts, including ours, have recognized a street-level connection between drugs, weapons, and violence. This connection provides police officers with the constitutionally required reasonable suspicion to conduct a *Terry* stop, or a legislature with a justification for imposing harsher sentences on drug offenders. *See Harmelin,* 501 U.S. at 1002–03, 111 S.Ct. at 2706; *Terry v. Ohio,* 392 U.S. 1, 27, 88 S.Ct. 1868, 1883, 20 L.Ed.2d 889 (1968). But this connection is stereotypical, and is necessary to protect police officers and to deter drug crimes. *See Harmelin,* 501 U.S. at 1002, 111 S.Ct. at 2706; *Terry,* 392 U.S. at 27, 88 S.Ct. at 1883.

■ A stereotypical connection, however, is insufficient to raise more than a scintilla of evidence that a person convicted of selling cocaine, without any accompanying evidence of violence, will foreseeably commit aggravated robbery leading to murder in the future. Here, we have no evidence that Love's cocaine sale involved any sort of violence or a weapon. While the smell of marijuana or the suspicion that a defendant possesses narcotics might provide a police officer sufficient justification to frisk a suspect for weapons under *Terry,* a seven-year-old conviction for "dealing" cocaine, standing alone, does not make it foreseeable that a defendant will commit a violent crime in the future. *Compare Terry,* 392 U.S. at 27, 88 S.Ct. at 1883, *Brown,* 188 F.3d at 865, *Brown,* 913 F.2d at 572, *and Trullo,* 809 F.2d at 113, *with Ramirez,* 196 S.W.3d at 796–97, *Doe,* 907 S.W.2d at 478, *and Frith,* 2002 WL 1565664, at *4. Without any indication that a past crime involves weapons or violence, that past crime does not indicate a propensity for future violent, assaultive criminal conduct sufficient to impose liability on another who failed to detect the past crime. *See Ramirez,* 196 S.W.3d at 796–97; *Doe,* 907 S.W.2d at 478; *Frith,* 2002 WL 1565664, at *4. We therefore hold that Barton has failed to produce more than a scintilla of evidence that, even assuming that Whataburger should have discovered Love's criminal history, given that history, it was reasonably foreseeable that Love would conspire in the aggravated robbery that resulted in Dean's murder. *See*

*Chapman,* 118 S.W.3d at 751; *Jackson v. Fiesta Mart, Inc.,* 979 S.W.2d 68, 70–71 (Tex.App.-Austin 1998, no pet.).

*Failure to Provide a Safe Workplace*

Barton further contends that, even if it was not legally foreseeable that Love would engineer the crime that resulted in Dean's murder, Whataburger generally knows of an increased risk of a violent crime occurring at restaurants open late at night and should have taken reasonable security measures to prevent it. Relying on the Texas Supreme Court's decision in *Timberwalk,* Whataburger responds that the robbery that occurred was not reasonably foreseeable on this basis either. 972 S.W.2d at 756.

██ Employees are the invitees of their employer. *Hernandez v. Heldenfels,* 374 S.W.2d 196, 197 (Tex.1963); *Allen v. Connolly,* 158 S.W.3d 61, 65 (Tex.App.-Houston [14th Dist.] 2005, no pet.). In *Timberwalk,* the Texas Supreme Court held that "[w]hen general danger to invitees is the risk of injury from criminal activity by third parties, the evidence must reveal specific previous crimes on or near the premises in order to establish foreseeability of harm." 972 S.W.2d at 756; *Allen,* 158 S.W.3d at 66. We determine whether the risk of criminal conduct was foreseeable to Whataburger "in light of what the premises owner knew or should have known before the criminal act occurred." *Timberwalk,* 972 S.W.2d at 757; *Allen,* 158 S.W.3d at 66. In that vein, we consider (1) whether any criminal conduct previously occurred on or near the property, (2) how recently it occurred, (3) how often it occurred, (4) how similar the conduct was to the conduct under review, and (5) the publicity of the occurrences, as to indicate that the landowner knew or should have known about them. *Timberwalk,* 972 S.W.2d at 757; *Stewart v. Co-*

*lumbia Med. Ctr. of McKinney Subsidiary, L.P.,* 214 S.W.3d 659, 663 (Tex.App.-Dallas 2007, pet. denied).

██ As an initial matter, Barton contends that the *Timberwalk* analysis should not apply in this case because *Timberwalk* dealt with premises liability and the duty owed to invitees, not the nondelegable duties an employer owes to its employees. Although premises liability and employer liability are distinct theories, the Texas Supreme Court has observed that "the nature of the duty of the landowner to use reasonable care to make his premises reasonably safe for the use of his invitees may, in all material respects, be identical with the nature of the duty of the master to use reasonable care to provide his servant with a reasonably safe place to work...." *Sears, Roebuck & Co. v. Robinson,* 154 Tex. 336, 340, 280 S.W.2d 238, 240 (1955); *see Allen,* 158 S.W.3d at 65. The incidence of violent crime, the foreseeability of violent crime on Whataburger's premises, and the preventative measures that Whataburger could or did implement in view of the risk of such crime were the same for Whataburger in its capacity as employer as they were for Whataburger in its capacity as premises occupier. *See Allen,* 158 S.W.3d at 66; *see also Wise v. Complete Staffing Servs., Inc.,* 56 S.W.3d 900, 905 (Tex.App.-Texarkana 2001, no pet.) (in context of preventing criminal conduct, noting lack of authority "imposing an expanded duty on an employer or suggesting that an employee under this type of allegation of harm is a part of a specially protected group"). In Texas, no legal basis exists to treat Whataburger's duty to exercise reasonable care, as an employer, in providing a reasonably safe workplace differently from Whataburger's duty, as premises occupier, to use ordinary care in protecting invitees from criminal acts of third parties. *Robinson,* 280 S.W.2d at

240; *Allen,* 158 S.W.3d at 66. We thus agree with our sister court of appeals that the *Timberwalk* analysis applies in the context of an employer's duty to exercise reasonable care in providing a safe workplace for its employees when an employee asserts that the employer breached its duty by failing to protect the employee from criminal acts. *See Allen,* 158 S.W.3d at 66; *see also Gibbs v. ShuttleKing, Inc.,* 162 S.W.3d 603, 609–10 (Tex.App.–El Paso 2005, pet. denied) (applying *Timberwalk* analysis in context of employer-employee relationship).

Barton further contends that the *Timberwalk* analysis should not apply in this case because the robbers perpetrated their crime with the assistance of Love, Whataburger's manager on duty. Barton asserts that the *Timberwalk* factors, which are used to determine the foreseeability of a criminal act on an owner's premises, apply only to random crime, not to a targeted crime accomplished by, or with the assistance of, an insider. *See Timberwalk,* 972 S.W.2d at 757–59. Barton is correct that the *Timberwalk* factors are more applicable to random crime than targeted crime, but the preventative measures that Barton contends Whataburger should have implemented to prevent a robbery by a random criminal or an insider are the same, save for Whataburger's decision to hire Love in the first instance. In this sense, the *Timberwalk* factors assist in determining whether fact issue exists as to the foreseeability of the robbery based on the evidence that Barton advances regarding the general foreseeability of criminal activity at the restaurant. *See id.* And, the Dallas Court of Appeals used the *Timberwalk* factors in analyzing the foreseeability of targeted crime. *See Stewart,* 214 S.W.3d at 663 (applying *Timberwalk* to test foreseeability of targeted shooting of employee).

Barton produced some evidence of criminal activity at the Whataburger in the years preceding Dean's murder: in July 1997, six years before the incident, a customer was shot in the parking lot, and another customer in the drive-through lane was robbed and shot in the thigh; in July 1998, a customer was robbed in the drive-through lane; in June 1999, a customer's purse was stolen; in July 2000, a customer reported an assault (without injury); in April 2001, a woman sought help in the Whataburger, reporting that she had been shot; in August 2001, a woman reported an assault (without injury); in February 2002, a woman reported that her car was stolen from her in the parking lot; in April 2002, one customer intentionally hit another customer's vehicle in the drive-through lane (with property damage but not injury); and, in February 2003, police arrested a person who refused to leave the premises.[2]

In contrast, no evidence exists that the Whataburger was the scene of any aggravated assault, aggravated robbery, sexual assault, or murder in the three years prior to Dean's murder. No crime similar to this one had ever occurred: no one had ever robbed the restaurant before, nor had it ever been the scene of any workplace violence, nor had anyone ever committed any sort of crime against a Whataburger

---

2. Relying on our court's opinion in *Love v. State,* the parties note that, the day before Dean's murder, Love met with his fellow conspirators outside the restaurant. 199 S.W.3d 447, 449 (Tex.App.–Houston [1st Dist.] 2006, pet. ref'd). As part of his alibi, Love told coworkers that these men "were attempting to rob someone at the restaurant," but he had convinced them not to. *Id.* Love told his boss, Davilyn Spencer, that the men merely had complained about their food. *Id.* at 450. Love did not notify police or management of this event. *Id.*

employee, nor had anyone ever been murdered.

Comparing this evidence with other, similar cases in Texas, we agree with the trial court that the evidence does not show the rampant, violent criminal activity sufficient to raise a fact issue about the foreseeability of the aggravated robbery that resulted in Dean's murder. *See Timberwalk*, 972 S.W.2d at 758 ("On the other hand, the complete absence of previous crimes, or the occurrence of a few crimes over an extended time period, negates the foreseeability element."); *Allen*, 158 S.W.3d at 67; *compare Jai Jalaram Lodging Group, L.L.C. v. Leribeus*, 225 S.W.3d 238, 245–46 (Tex.App.–El Paso 2006, pet. denied) (holding that no duty existed when incident reports within two years before, while showing a rise in criminal activity, did not show any notable frequency nor were they of the kind that would have facilitated the violent personal crime in question), *Gibbs*, 162 S.W.3d at 612 (holding that robbery of bus was not foreseeable because plaintiff produced no evidence of similar robberies on same bus line), *and Allen*, 158 S.W.3d at 67 (holding that sexual assault was not foreseeable because plaintiff produced no evidence of similar criminal acts on or near defendant's premises), *with Trammell Crow Cent. Tex., Ltd. v. Gutierrez*, 220 S.W.3d 33, 40 (Tex.App.–San Antonio 2006, pet. granted) (holding that murder at shopping mall was foreseeable because plaintiff produced evidence of ten violent crimes at mall in previous two years), *and Dickinson Arms–REO, L.P. v. Campbell*, 4 S.W.3d 333, 335–36, 346 (Tex.App.–Houston [1st Dist.] 1999, pet. denied) (holding that carjacking and murder were foreseeable in light of 184 reported criminal incidents on premises during previous three years).

Barton's expert also averred that an undefined area surrounding the restaurant had a crime "index rate" four times greater than a national average and noted evidence of three drive-through robberies at other Whataburger restaurants, namely, an attempted drive-through robbery five miles away at Store No. 263, in November 1998, an attempted drive-through robbery sixteen miles away at Store No. 462 in December 1998, and a drive-through robbery five miles away at Store No. 605 in April 2003. The expert opined that "an industry standard of foreseeability" exists because of the well-known high risk of armed robbery to late-night convenience stores and restaurants, pointing in particular to a study of convenience store robberies and literature that concludes that "the greatest risk of workplace violence including homicide (80%) comes from being a victim of an armed robbery." Barton further asserts that Whataburger foresaw the risk of crime on its premises because a previous manager had employed a security guard on the weekends to work the early morning hours. A new store manager discontinued the practice in 2002, after determining that it was not cost-effective.

■ Under *Timberwalk*, general evidence of crime rates and of robberies in other locales cannot create "an industry standard of foreseeability" sufficient to impose a duty to prevent crime. *See Timberwalk*, 972 S.W.2d at 757 ("Statistics regarding large or undefined geographic areas do not by themselves make crime foreseeable at a specific location."). None of the robberies occurred at a restaurant closer than five miles to the Whataburger at issue in this case. "For a landowner to foresee criminal conduct on property, there must be evidence that other crimes have occurred on the property or in its immediate vicinity." *Id.* Courts generally rely on small geographic areas in considering crime in the "immediate vicinity." *See id.* at 757, 759. (considering apartment

complex, neighboring complexes, and one-mile radius around complex); *see also Mellon Mortgage Co. v. Holder*, 5 S.W.3d 654, 664 (Tex.1999) (considering parking garage and one-quarter mile radius around garage); *Gibbs*, 162 S.W.3d at 612 (holding that evidence of bus robberies in other states did not make bus robbery in Texas foreseeable); *Tex. Real Estate Holdings, Inc. v. Quach*, 95 S.W.3d 395, 398–99 (Tex.App.–Houston [1st Dist.] 2002, pet. denied) (considering premises and area of 3.5 square miles around premises); *Campbell*, 4 S.W.3d at 338–39 (considering apartment complex, nearby hotel, two nearby apartment complexes, all located within one-square-mile); *Plowman v. Glen Willows Apartments*, 978 S.W.2d 612, 618 (Tex.App.–Corpus Christi 1998, pet. denied) (considering apartment complex and neighborhood surrounding complex).

■ Finally, Barton's contention that Whataburger's earlier employment of a security guard on the weekends proves the foreseeability of the robbery is unavailing. "The mere act of taking preventative measures to protect against the possibility of future crime is not the same as foreseeing that criminal activity." *Allen*, 158 S.W.3d at 67. If we equated preventative measures to foreseeability, we would "virtually eliminate the foreseeability requirement for a negligence claim against a person who installs a security system or takes other preventative measures to guard against crime." *Id.*; *accord Stewart*, 214

S.W.3d at 665; *Garcia*, 203 S.W.3d at 437–38 (holding that targeted murder committed on premises of Sonic restaurant was not foreseeable result of Sonic's failure to employ security guard).

■ Applying the *Timberwalk* factors of proximity, recency, frequency, similarity, and publicity, we conclude that Barton has failed to raise a fact issue that the aggravated robbery resulting in Dean's murder at the Whataburger restaurant was foreseeable, so as to impose a duty on Whataburger to take reasonable measures to prevent it. *See Timberwalk*, 972 S.W.2d at 757, 759 (holding that criminal conduct on premises was not foreseeable); *Allen*, 158 S.W.3d at 66–67 (same); *Quach*, 95 S.W.3d at 400–01 (same).[3]

*Other Acts of Negligence*

Lastly, Barton contends that Whataburger's employees were negligent in violating its own company policies and procedures to minimize the risk of theft or robbery. Specifically, Barton alleges that Whataburger's employees committed the following acts of negligence: (1) store manager Davilyn Spencer left her safe key at the restaurant at the end of her shift; (2) Murray left his shift early without notifying Spencer; (3) Murray failed to count the money in the registers and deposit the excess in the safe at the end of his shift; and (4) Murray failed to notify Spencer that no manager would be on duty during the shift in which Dean was killed. Readi-

---

3. Barton's expert lists a number of security measures that the restaurant lacked that placed it below the standard in the industry for security for an all-night establishment. Among these are Whataburger's failures to provide video surveillance, to assess and report security risks, and to physically prevent ingress to the restaurant through the drive through window. Whataburger responds that none of these measures would have prevented this crime, given Love's involvement and the fact that, later the same evening, the criminals robbed a Shipley doughnut store that had some of the security measures that Barton's expert recommended. Given our holding that this crime was unforeseeable, we do not address Barton's allegations of departure from industry standards or Whataburger's response that additional security would have been fruitless, negating any "but for" causation for this evidence.

ly available cash, and a key to the safe, Barton argues, "gave Greg Love exactly what he was looking for" in planning the robbery.

But, as Texas cases and the Restatement observe, foreseeability requires more than "afford[ing] an opportunity" to commit a crime. The aggravated robbery and murder at the Whataburger was an extraordinary event, with the record containing no evidence that anyone had ever attempted to rob the restaurant, much less at gunpoint, before. Nothing in the record indicates that Love had any history of violence. An aggravated robbery and murder is not the ordinary result of the situation created by Spencer and Murray's alleged negligence. *See Pena*, 990 S.W.2d at 755–56; *Whitten*, 427 S.W.2d at 315 (noting that intervening force can rise to level of superseding cause when its operation or consequences are extraordinary). The evidence is undisputed that the robbery was a wrongful act and that at least three of the men involved have been convicted of Dean's murder—Marshall is sentenced to death and Love to life in prison. *See Pena*, 990 S.W.2d at 754; *Whitten*, 427 S.W.2d at 315; *see also Marshall v. State*, 210 S.W.3d 618, 620, 637 (Tex.Crim.App. 2006); *Love*, 199 S.W.3d at 449, 457. We hold that these wrongful acts are a superseding cause of Dean's death, and the trial court properly granted Whataburger's no-evidence summary judgment on Barton's ordinary negligence claims. *See Pena*, 990 S.W.2d at 756 (holding that murder committed by minor gang members was not foreseeable result of sale of alcohol to gang members); *Pichardo v. Big Diamond, Inc.*, 215 S.W.3d 497, 502–03 (Tex.App.–Fort Worth 2007, no pet.) (holding that injury caused by criminal fleeing after stealing gas from gas station was not foreseeable result of station's policy of not requiring customers to pre-pay for gas); *Garcia*, 203 S.W.3d at 437–38

(holding that targeted murder committed on premises of Sonic restaurant was not foreseeable result of Sonic's failure to employ security guard); *Boggs v. Bottomless Pit Cooking Team*, 25 S.W.3d 818, 824–25 (Tex.App.–Houston [14th Dist.] 2000, no pet.) (holding that murder committed by customer was not foreseeable result of excessive sale of alcohol to customer); *Cowart*, 20 S.W.3d at 784–86 (holding that murder committed by third party was not foreseeable result of ammunition sale to minor).

## Conclusion

We hold that the trial court properly granted summary judgment because the diabolic conduct of others—men who committed aggravated robbery and murder—was a superseding cause of Dean's death that was not reasonably foreseeable to Whataburger. We therefore affirm the judgment of the trial court.

## ORDER ON MOTION FOR REHEARING EN BANC

JANE BLAND, Justice.

Appellant, Rose Barton, moved for en banc consideration. A majority of the Court voted to deny en banc consideration. It is therefore ORDERED that appellant's motion is denied.

It is so **ORDERED.**

Appellant moved for en banc consideration. *See* TEX.R.APP. P. 41.2(c).

A majority of the Court voted to deny en banc consideration. *See* TEX.R.APP. P. 49.7.

The en banc court consists of Chief Justice RADACK and Justices TAFT, JENNINGS, KEYES, ALCALA, HANKS, HIGLEY, BLAND, and SHARP.

Justice JENNINGS, dissenting to the denial of en banc consideration, joined by Justices KEYES and Sharp.

Justice KEYES, dissenting to the denial of en banc consideration, joined by Justice SHARP.

TERRY JENNINGS, Justice, dissenting from the denial of en banc consideration.

The panel, in its opinion, erroneously holds that the trial court did not err in granting summary judgment against appellant, Rose Barton, Individually and as Personal Representative of the Estate of Christopher Martin Dean, "because the diabolic conduct of others—men who committed aggravated robbery and murder— was a superseding cause of Dean's death that was not reasonably foreseeable" to appellee, Whataburger, Inc., as a matter of law.

In this case, a Whataburger overnight-shift manager, Gregory Love, who had planned with others to rob the Whataburger restaurant he managed, was directly responsible under the law of parties[1] for the capital murder of Dean. Love had, prior to his employment by Whataburger, been convicted of and incarcerated for committing two felony offenses of delivery of crack cocaine[2] in Indiana.

In concluding that the general character of the actions of Love, which resulted in the capital murder of Dean, could not have been reasonably anticipated by Whatabur-

ger, the panel characterizes the real and inherent relationship between narcotics dealing and firearms and violence as "stereotypical" and conflates the duties owed by premises owners to their invitees with an employer's duties to exercise ordinary care in its hiring of employees and to provide its employees with a reasonably safe work environment. Accordingly, I respectfully dissent from the denial of en banc consideration of this case. *See* Tex.R.App. P. 41.2(c).

**Factual and Procedural Background**

Dean, a mentally disabled but "very dedicated" Whataburger employee of fourteen years, was murdered when he was shot in the face by Gerald Marshall, who was, at the direction of Love, attempting to rob the Whataburger restaurant at which Love served as manager. *See Love v. State,* 199 S.W.3d 447, 449–51 (Tex.App.-Houston [1st Dist.] 2006, pet. ref'd); *Worthy v. State,* No. 01–06–00134–CR, 2007 WL 624667, at *1–3, 6 (Tex.App.-Houston [1st Dist.] March 1, 2007, pet. ref'd) (mem. op., not designated for publication).

The underlying facts of this case, which are not in dispute, have already been summarized by this Court. *See Love,* 199 S.W.3d at 449–51; *Worthy,* 2007 WL 624667, at *1–3. One night prior to the robbery, Love met and spoke with Marshall in the Whataburger parking lot. *See Love,* 199 S.W.3d at 449. Love suggested that Marshall should return to the restau-

---

1. *See* Tex. Penal Code Ann. § 7.02(a)(2) (Vernon 2003) (stating that "[a] person is criminally responsible for an offense committed by the conduct of another if ... acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense").

2. In its briefing, Whataburger states that Love had been convicted of selling narcotics nine years prior to his Whataburger employment,

Love served one and one-half of a year of a three year penitentiary sentence, and was released for good behavior and placed on probation. The record contains deposition testimony stating that Love's conviction resulted in a sentence for eight years confinement, with five of those years suspended. The record also contains affidavit testimony that Love had been convicted of "two counts" of "dealing crack cocaine."

rant to commit a robbery on a night between 3:00 a.m. and 4:00 a.m., when Love was on duty. *Id.* Love "told Marshall to enter the store by climbing through the drive-through window." *Id.* This information was critical to the success of the robbery because Whataburger, like most fast-food restaurants, closed its dining room during its graveyard shift and only served customers through its drive-through window. *See id.; Worthy,* 2007 WL 624667, at *1.

Subsequently, on May 11, 2003, Love reported to work early, apparently in an attempt to entice the manager on the previous shift to leave early. *Love,* 199 S.W.3d at 450. Love's plan worked, as the manager left work early and entrusted Love with the money from the previous shift to count and place in the restaurant safe. *Id.* Shortly after the previous manager left, Love, who had been in contact with Marshall by cellular telephone, made up a story so that he could leave the restaurant. *Id.* Love then left Dean in charge of the restaurant and directly in the path of Marshall. *Id.*

Dean, although mentally disabled, was a hard-working man whose life's ambition was to one day own or manage a Whataburger restaurant. *Worthy,* 2007 WL 624667, at *6 (summarizing Barton's testimony that Dean loved "all of his jobs, but he loved Whataburger the most," his "biggest dream" was to own or manage a Whataburger restaurant, he "wore his Whataburger shirt everywhere, even to church," and he "was buried in his Whataburger shirt"). Dean, after noticing that Love had not counted the money in the registers from the previous shift, took it upon himself to count the money and deposit the excess amount, approximately $1,600, in the lockbox. *Love,* 199 S.W.3d at 451. Although Dean's dedication saved

Whataburger its money, it cost Dean his life.

At approximately 4:00 a.m., Marshall and two other men arrived as planned at the drive-through and placed an order. *Id.* When the men drove up to the window, Marshall grabbed Dean through the window and, as per Love's instructions, climbed through the drive-through window to enter the restaurant. *Id.* As the other Whataburger employees hid, Marshall chased Dean to the back of the restaurant and, with a firearm in hand, demanded that Dean give him the key to the safe. *Id.* Dean did not have a key to the safe because it could only be opened by combination. *Id.* After Marshall demanded a key from Dean three times and Dean did not produce the key, Marshall shot Dean in the face, ending Dean's life. *Id.*

Barton brought this wrongful death and survival lawsuit, alleging that the negligence of Whataburger proximately caused Dean's death. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 71.002(a)-(b), 71.004(a) (Vernon 2008). Specifically, Barton alleged that Whataburger failed to maintain a safe workplace, was negligent in hiring Love, a convicted narcotics trafficker, and was negligent in its supervision and training of its employees.

Whataburger moved for summary judgment, asserting that, as a matter of law, it was "under no duty to screen the criminal background" of Love and "the criminal incident made the basis of Barton's lawsuit was not foreseeable to Whataburger." *See* TEX.R. CIV. P. 166a(c). Whataburger also asserted that there is no evidence that "the criminal incident made the basis of Barton's lawsuit was foreseeable to Whataburger," "Whataburger breached a duty of care with respect to the hiring, training, and or supervision of its employees," or any "breach of duty by Whataburger was

the cause in fact" of Barton's injuries. *See* Tex.R. Civ. P. 166a(i).

Without stating its basis, the trial court granted summary judgment against Barton. As it does on appeal, Whataburger, in its summary judgment motion below, focused its arguments primarily on the issue of foreseeability, relying extensively on the duties that premises owners owe to their invitees and, specifically, upon the premises liability case of *Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749 (Tex.1998).

### Standard of Review

To prevail on a "matter-of-law" summary judgment motion, a movant has the burden of proving that it is entitled to judgment as a matter of law and that there is no genuine issue of material fact. Tex.R. Civ. P. 166a(c); *Cathey v. Booth*, 900 S.W.2d 339, 341 (Tex.1995). When a defendant moves for summary judgment, it must either (1) disprove at least one essential element of the plaintiff's cause of action or (2) plead and conclusively establish each essential element of its affirmative defense, thereby defeating the plaintiff's cause of action. *Cathey*, 900 S.W.2d at 341; *Yazdchi v. Bank One, Tex., N.A.*, 177 S.W.3d 399, 404 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). In reviewing the summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex.2005).

To prevail on a "no-evidence" summary judgment motion, a movant must allege that there is no evidence of an essential element of the adverse party's cause of action or affirmative defense. Tex.R. Civ. P. 166a(i); *Fort Worth Osteopathic Hosp., Inc. v. Reese*, 148 S.W.3d 94, 99 (Tex.2004). We review a no-evidence summary judg-

ment under the same legal sufficiency standard used to review a directed verdict. *Gen. Mills Rests., Inc. v. Tex. Wings, Inc.*, 12 S.W.3d 827, 832–33 (Tex.App.-Dallas 2000, no pet.). Although the nonmoving party is not required to marshal its proof, it must present evidence that raises a genuine issue of material fact on each of the challenged elements. Tex.R. Civ. P. 166a(i); *see Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex.2004). A no-evidence summary judgment motion may not be properly granted if the nonmovant brings forth more than a scintilla of evidence to raise a genuine issue of material fact on the challenged elements. *See Ridgway*, 135 S.W.3d at 600. More than a scintilla of evidence exists when the evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions." *Merrell Dow Pharms., Inc. v. Havner*, 953 S.W.2d 706, 711 (Tex.1997) (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex.1995)). When reviewing a no-evidence summary judgment motion, we assume that all evidence favorable to the nonmovant is true and indulge every reasonable inference and resolve all doubts in favor of the nonmovant. *Spradlin v. State*, 100 S.W.3d 372, 377 (Tex.App.-Houston [1st Dist.] 2002, no pet.). In sum, "[j]udgment without ... a jury verdict is proper at any course of the proceedings *only when the law does not allow reasonable jurors to decide otherwise.*" *City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005) (emphasis added) (further noting that "test for legal sufficiency should be the same for summary judgments, directed verdicts, judgments notwithstanding the verdict, and appellate no-evidence review").

### Foreseeability

The common law claim of negligence consists of three essential elements—a le-

gal duty owed by one person to another, a breach of that duty, and damages proximately resulting from the breach. *El Chico Corp. v. Poole,* 732 S.W.2d 306, 311 (Tex.1987). Duty is the threshold inquiry because a plaintiff must prove the existence and violation of a duty owed to her by a defendant to establish liability in tort. *Id.* In describing "duty," the Texas Supreme Court has explained:

> ... if a party negligently creates a situation, then it becomes his duty to do something about it to prevent injury to others if it reasonably appears or should appear to him that others in the exercise of their lawful rights may be injured thereby.

*Id.* (*quoting Buchanan v. Rose,* 159 S.W.2d 109, 110 (Tex.1942)). Generally, the existence of duty is a question of law for a court to decide from the facts surrounding the occurrence in question. *Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 525 (Tex.1991). However, when the evidence or the reasonable inferences to be drawn therefrom about foreseeability as it relates to duty are disputed, the question becomes one for the jury, and the trial court should instruct a jury about this element so that it can resolve the factual issues. *Union Pacific R.R.Co. v. Williams,* 85 S.W.3d 162, 169 (Tex.2002); *Mitchell v. MissouriKansas–Texas R.R. Co.,* 786 S.W.2d 659, 662 (Tex.1990). "[W]here the risk reasonably to be perceived defines the duty to be obeyed; i.e., where knowledge and foreseeability are important elements of duty," the issue is "properly and best resolved by the finder of fact." *Mitchell,* 786 S.W.2d at 662.

In determining whether a defendant was under a particular duty, courts "consider several interrelated factors, including the risk, foreseeability, and likelihood of an injury weighed against the social utility of an actor's conduct, the magnitude of the burden of guarding against injury, and the consequences of placing the burden on the defendant." *Phillips,* 801 S.W.2d at 525. Of all of these factors, foreseeability of the risk is "the foremost and dominant consideration." *Id.* Specifically, before liability will be imposed for an act of negligence, the evidence must justify a finding that the party committing the negligent act "ought to have foreseen the consequences thereof in the light of the attendant circumstances." *Carey v. Pure Distrib. Corp.,* 133 Tex. 31, 124 S.W.2d 847, 849 (Tex. 1939).

However, it is not required that the particular accident or event complained of should have been foreseen. *Id.* Rather, as explained by the Texas Supreme Court,

> All that is required is that the "injury be of such general character as might reasonably have been anticipated; and that the injured party should be so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen."

*Id.* (quoting *San Antonio A.P. Ry. Co. v. Behne,* 231 S.W. 354, 356 (Tex. Comm'n App.1921)).

Generally, there is no duty to control the conduct of a third person. *Phillips,* 801 S.W.2d at 525 (citing RESTATEMENT (SECOND) OF TORTS § 315 (1965)). However, this general rule does not apply when a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct. *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 315(a) (1965)). Such special relationships include the relationship between employer and employee. *Id.* (citing RESTATEMENT (SECOND) OF TORTS § 317 (1965)). Thus, even when an employee, such as Love, acts outside the scope of his employment, an employer has a duty to exercise reasonable care to control its employee to prevent him from in-

tentionally harming others, or from so conducting himself as to create an unreasonable risk of bodily harm to them, if the employee is upon the employer's premises, or uses the employer's property, and the employer knows, or has reason to know, that he has the ability to control the employee and knows, or should know of, the necessity and opportunity for exercising such control. RESTATEMENT (SECOND) OF TORTS § 317.

It is true that an employer, like Whataburger, is not an insurer of its employees' safety. *Kroger Co. v. Elwood*, 197 S.W.3d 793, 794 (Tex.2006); *Leitch v. Hornsby*, 935 S.W.2d 114, 117 (Tex.1996); *Exxon Corp. v. Tidwell*, 867 S.W.2d 19, 21 (Tex. 1993). However, Texas law recognizes that an employer does have a duty to (1) provide rules for the safety of employees and warn them of reasonably foreseeable hazards; (2) furnish reasonably safe machinery and equipment; (3) furnish a reasonably safe place to work; and (4) exercise ordinary care to select careful and competent fellow employees. *Fort Worth Elevators Co.*, 123 Tex. 128, 135–36, 70 S.W.2d 397, 401 (1934); *see also Kroger Co.*, 197 S.W.3d at 794; *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 186 n. 45 (Tex.2004).

Thus, the fundamental questions about foreseeability before this Court are (1) whether the injury to Christopher Dean was "of such general character as might reasonably have been anticipated" by Whataburger after it had hired and placed Love, a man previously convicted on two counts of felony delivery of narcotics, into one of its restaurants as a night-shift manager, and (2) whether Dean was "so situated with relation to the wrongful act[s]" of Love that injury to him or his fellow employees "might reasonably have been foreseen."

Here, in support of its matter-of-law summary judgment motion under rule 166a(c), Whataburger attached evidence showing that it had hired Love on November, 19, 2002, and, on December 31, 2002, promoted him from "team-leader" to manager. Also, when filling out his job application, Love represented that he had no prior felony convictions, and Whataburger paid for a criminal background check, which revealed that Love, from November of 1995 to November of 2002, had no criminal record in Harris County, Texas. Furthermore, while employed by Whataburger for almost six months, Love had not received any reprimands for any "criminal or dangerous" conduct. Whatabuger also attached evidence that showed, five years prior to the robbery, the restaurant experienced only five "criminal incidents" that had been reported to Whataburger employees and, in the three years prior to the robbery, there had not been any aggravated assaults, sexual assaults or murders committed at the restaurant.

Barton attached to her response to Whataburger's summary judgment motion the affidavit testimony of Chris McGoey. McGoey, the president of his own security consulting firm for over 21 years, testified that he has written a book, several book chapters, and over 90 articles on the subjects of crime foreseeability, premises liability, workplace violence, and fast-food restaurant security. After reviewing the police offense report, the court records, Houston Police Department records, Whataburger records, numerous witness statements and depositions, and the crime scene photographs, McGoey wrote his report on the capital murder of Christopher Dean.

In his affidavit, McGoey testified that [T]he greatest risk of serious workplace violence including homicide (80%) comes from being a victim of an armed rob-

bery. Workplace homicide was the second leading cause of death to American workers, Late night eating and drinking places are identified as one of the high-risk retail establishments that constitute the largest share of workplace homicides.

It comes as no surprise that, generally, perpetrators do not randomly target the businesses that they attack. Rather, they select their targets based on a risk analysis of a business' various weaknesses, including escape routes, number of employees and customers, and lack of security guards, alarms, bullet-resistant barriers, and surveillance equipment. Accordingly, as per McGoey, most convenience stores and fast-food chains have implemented a number of important and effective security measures to reduce the risk that their employees will be robbed.

McGoey emphasized that Whataburger was the only fast-food chain of which he was aware that had "failed to develop a comprehensive robbery prevention program to protect its employees." At the time of the capital murder of Dean, Whataburger had no security manual or methodology in place. There were no minimum standards published or training provided to managers, and "Whataburger's conduct of not addressing workplace violence and robbery prevention fell below the standard of care and constituted malice or conscious indifference to the magnitude of the risk of harm and disregard for the safety of its employees. This conduct was a proximate cause of Christopher Dean's death."

According to McGoey, Whataburger was "about twenty years behind the industry standard." Moreover, by delegating the responsibility of security to local restaurant managers, who were required to reduce expenditures and then received a bonus for doing so, Whataburger had created a strong disincentive for managers to spend adequate money on drive-through window maintenance, security cameras, alarms, and security guards. McGoey, in his testimony, also highlighted several robberies in which a robber had entered a Whataburger restaurant through its inadequate drive-through windows, and at least one of the robberies was thought to be an "inside job." McGoey opined,

Greg Love merely took advantage of a restaurant that lacked basic fast-food restaurant security systems, lacked robbery prevention training, had poor security procedures, and lacked adequate supervision by other managers. Proper security measures implemented by Whataburger would have taken most of the opportunity away from Greg Love and thereby prevented the robbery. For example, a time-delay safe with access controlled by the general manager; not carelessly leaving both keys in the safe; swing shift manager dropping cash; a modern self-closing and lockable drive-thru window; off-duty police officer; and a combination of surveillance camera and hold-up alarm system as significant deterrents. Of course a proper pre-employment background check would have kept Greg Love from having a position of responsibility and opportunity.

McGoey noted that a series of armed robberies at the restaurant in question in 1997–1998 "should have been a wake-up call to implement adequate security measures in keeping with the established industry standards." Although the restaurant did temporarily employ off-duty police officers after these robberies, it terminated their services, and Whataburger should have foreseen the risk that violent crime would return because "basic fast-food robbery prevention measures were not implemented to fill the deterrence void."

In regard to the negligent hiring of Love, McGoey testified that it is "the industry standard of care to conduct criminal background checks on all restaurant manager applicants in *every county where they had lived.*" (Emphasis added.) In fact, he noted that Whataburger's own security experts agreed that Whatabuger had a duty to conduct criminal background checks, managers can be involved in dishonest acts, including robberies, such checks should include more than one county of residence, and no job offer should be made until the check is completed. McGoey also noted that although Whatabuger's Corporate Director had discussed with *Restaurants Today* the importance of protecting employees from crime by conducting thorough interviews and background checks, Whatabuger, for cost reasons, limited its background check of Love to Harris County only.

Specifically, McGoey noted that Whatabuger had paid $11.00 to William Saxon to perform the criminal background check on Love in Harris County only. Although Saxon had informed Whataburger in 1995 that he could "easily" check criminal records in any county in the nation for a reasonable fee, and Saxon had the ability of performing a "Positive ID" search of Love's social security number, Whataburger chose to request only a minimal search at a base price. McGoey testified that, using the information available to Whataburger, he discovered Greg Love's felony convictions on the Internet in a matter of minutes for $35.00. He also noted that the first three digits of Love's social security number obviously indicated that he was born in Indiana. McGoey agreed with one of Whatburger's own security consultant's that a one-county criminal background search was inadequate. McGoey concluded that

In my opinion, hiring a felon convicted for narcotics sales was a very careless

decision especially for a manager job that involves safety of a crew in a late-night fast-food restaurant. Whataburger's conduct fell far below the standard of care in background screening to the point were it constituted malice or conscious indifference to the magnitude of risk and safety of its employees and a proximate cause of Christopher Dean's death.

In its reply to Barton's response to its summary judgment motion, Whataburger stressed its no-evidence assertions and contended that Barton had failed to answer the question, "How was Whataburger supposed to have known that Greg Love would plan an inside job?" Whataburger then repeated its contention that there is a lack of foreseeability on Barton's negligent hiring claim and, based on *Timberwalk*, a lack of foreseeability on what it labels as Barton's "Premises Security Claim."

The readily apparent problem with both of these contentions is that (1) Barton has not alleged a "Premises Security Claim" or any kind of premises liability claim and (2) the pertinent foreseeability question presented for consideration in this case is not the question that Whataburger has artfully framed. Nevertheless, in Barton's appeal, the panel erroneously holds that Barton:

(1) "failed to produce more than a scintilla of evidence" that, even assuming that appellee, Whataburger, Inc., should have discovered Love's criminal history, "it was reasonably foreseeable that Love would conspire in the aggravated robbery that resulted in Dean's murder," and

(2) "failed to raise a fact issue" on "the *Timberwalk* factors of proximity, recency, frequency, similarity, and publicity" that "the aggravated robbery resulting in Dean's murder at the Whatburger restaurant was fore-

seeable, so as to impose a duty upon Whatabuger to take reasonable measures to prevent it."

Moreover, relying on its analysis in making these holdings, the panel further erroneously holds that, in regard to Barton's claims regarding Whataburger's other acts of negligence, "the trial court properly granted summery judgment because the diabolic conduct of others—men who committed aggravated robbery and murder—was a superseding cause of Dean's death that was not reasonably forseeable to Whataburger."

### Negligent Hiring

In regard to the first holding on Barton's negligent hiring claim, as noted by the panel in its opinion, the case law recognizing the inherent connection between narcotics dealing and violence is legion. *See, e.g., Carmouche v. State,* 10 S.W.3d 323, 330 (Tex.Crim.App.2000) ("Since weapons and violence are frequently associated with drug transactions, the officers reasonably believed that the individual with whom they were dealing was armed and dangerous."); *Chase v. State,* No. 01–02–00536–CR, 2003 WL 1563761, at *2 (Tex.App.-Houston [1st Dist.] March 27, 2003, pet. ref'd) (mem. op., not designated for publication) (same). Yet, the panel considers this connection as being merely "stereotypical, and is necessary to protect police officers and deter crime."

However, the harsh reality, as recognized by the law and the public, is that the connection between narcotics dealing and violent crime is quite real—it is not merely "stereotypical." *See id.* On a daily basis, our newspapers and local television news programs report of homicides related to narcotics deals "gone bad." Moreover, it is within our common knowledge that those involved in dealing in narcotics are generally considered by law enforcement authorities to be particularly dangerous

individuals. In addition to this obvious, inherent connection between narcotics dealing and weapons and violence, it is also fair to note that one who chooses to engage in the unlawful selling of narcotics is doing so with the express purpose of acquiring money by illegitimate means. It is reasonable to infer that a person who is willing to sell narcotics to acquire money unlawfully, a crime that carries with it the threat of serious criminal punishment and significant periods of confinement, and a person who has in fact been convicted on two counts of dealing narcotics, would also be willing to engage in other unlawful conduct, such as theft and robbery, to acquire money unlawfully. It seems self evident that a fast-food restaurant, in order to provide a safe working environment for its other employees, should consider these simple facts before hiring a convicted narcotics dealer to serve as the night manager of one of its restaurants.

Here, the record shows that Whataburger was aware of these connections at the time it hired Love. As noted by Barton in her motion for en banc rehearing (1) Whataburger's area manager testified, "If I was aware that he had committed a felony, sir, I would not have hired him"; (2) Whataburger's security consultant, when asked whether a person's convictions for dealing narcotics would make him ineligible for employment, testified, "I don't know quite how to answer that—it's so obvious, I don't know how to answer the question. He's not the type of person you would want running the store"; and (3) Whataburger's screening agent testified that he would not have hired someone who had been convicted of theft, violent crimes, or dealing narcotics.

To survive Whataburger's summary judgment motion on her negligent hiring claim, Barton was not required to show that Whataburger should "have known

that Greg Love would plan an inside job" or that Whataburger should have foreseen the specific criminal event that lead to Dean's death. *Carey*, 124 S.W.2d at 849. Rather, as explained by the Texas Supreme Court, she was only required to demonstrate that the injury of Christopher Dean was "of such general character as might reasonably have been anticipated" and that Dean was "so situated with relation to the wrongful act that injury to him or to one similarly situated might reasonably have been foreseen." *Id.*

Here, Barton, through McGoey, presented evidence that Love took advantage of his position in a restaurant that "lacked basic fast-food restaurant security systems, lacked robbery prevention training, had poor security procedures, and lacked adequate supervision by other managers." McGoey further testified that, in his opinion, "hiring a felon convicted for narcotics sales was a very careless decision especially for a manager job that involves safety of a crew in a late-night fast-food restaurant." Why? Because common sense dictates that hiring an individual with a felony conviction on two counts of delivery of narcotics and placing him in a night-time management position at a fast-food restaurant in charge of other employees would obviously endanger the restaurant and the safety of those employees. In this case, a reasonable juror could conclude that given Love's criminal history, his actions were foreseeable. Accordingly, I would hold that Barton's evidence demonstrates that the injury to Dean was of such general character as might reasonably have been anticipated by Whataburger and that Dean was so situated with relation to the wrongful acts of Love that injury to him and other employees in the restaurant was reasonably foreseeable. At the very least, Barton presented some evidence of fore-

seeability, and, although the evidence and the inferences arising from that evidence may be disputed by Whataburger, a factfinder should be allowed to resolve any such fact issues. *See Union Pacific R.R. Co.*, 85 S.W.3d at 169; *Mitchell*, 786 S.W.2d at 662.

### Failure to Provide Safe Workplace and Ordinary Negligence

In regard to the panel's holding that Barton has "failed to raise a fact issue" on "the *Timberwalk* factors of proximity, recency, frequency, similarity, and publicity" and the panel's more general holding that "the diabolic conduct of others ... was a superseding cause of Dean's death that was not reasonably foreseeable to Whataburger,"[3] the panel conflates the duties owed by premises owners to their invitees with an employer's duties to exercise ordinary care in its hiring of employees and to provide its employees with a reasonably safe work environment. As noted by Barton in her Motion for En Banc Rehearing, the panel opinion "erases the traditional distinction between employer cases and premises liability cases." Barton further notes that "this is not a premises liability case."

The panel agrees with the Fourteenth Court of Appeals that the *Timberwalk* analysis applies "in the context of an employer's duty to exercise reasonable care in providing a safe workplace for its employees when an employee asserts that the employer breached its duty by failing to protect the employee from criminal acts." *See Allen v. Connolly*, 158 S.W.3d 61, 65 (Tex.App.-Houston [14th Dist.] 2005, no pet.). The Texas Supreme Court did, as noted by the panel, hold in *Timberwalk* that "[w]hen the 'general danger' is the risk of injury from criminal activity, the evidence must reveal 'specific previous

---

**3.** The majority discusses the concept of "su-  perseding cause" in regard to all claims.

crimes on or near the premises' in order to establish foreseeability." 972 S.W.2d at 756. Also, the Fourteenth Court in *Allen* did conclude that "because Allen [an employee] assert[ed] that Connolly [had] breached her negligence duty as employer by failing to exercise reasonable care to protect Allen from third party criminal acts, the *Timberwalk* analysis applie[d] to determine whether Connolly owed a negligence duty to Allen under the facts of [the] case." 158 S.W.3d at 66.

The panel in the instant case and the Fourteenth Court in *Allen* both quote *Sears, Roebuck & Co. v. Robinson* for the proposition that "the nature of the duty of the landowner to use reasonable care to make his premises reasonably safe for the use of his invitees may, in all material respects, be identical with the nature of the duty of the master to use reasonable care to provide his servant with a reasonably safe place to work...." 154 Tex. 336, 280 S.W.2d 238, 240 (1955). However, the supreme court explicitly qualified this statement by noting that "[t]he two fields of law (landowner-invitee and master-servant), are entirely separate, and they should be kept so." *Id.* Thus, *Sears* does not support the panel's and the Fourteenth Court's conclusions that a *Timberwalk* analysis applies in either case.

More importantly, the *Timberwalk* analysis is simply not applicable in the instant case.[4] In *Timberwalk,* the supreme court was concerned with the issue of foreseeability in the context of the complaint that a landowner had negligently failed to provide adequate security at an apartment complex to protect a tenant from the sexual assault of a third person. 972 S.W.2d at 751. The court noted that the plaintiff's claim was a premises liability claim, not a negligent activity claim, because the case concerned the alleged "failure to use ordinary care to reduce or eliminate an unreasonable risk of harm created by a premises condition" which the landowner knew about or in the exercise or ordinary care should have known about. *Id.* at 753. Thus, the court noted that a landowner owes a duty to use ordinary care to protect an invitee from the criminal acts of third parties "only when the risk of criminal conduct is so great that it both unreasonable and foreseeable." *Id.* at 756.

Here, Barton's complaint simply does not concern a premises condition, and the *Timberwalk* factors to determine whether an occurrence of certain criminal conduct at the Whatabuger restaurant was foreseeable are not applicable. Barton is not complaining that Whataburger failed to use ordinary care to protect her son from some random act of violence committed by an unknown third party who happened to

---

4. After the panel issued its opinion, the Texas Supreme Court issued its opinion in *Trammell Crow Cent. Texas, Ltd. v. Gutierrez,* 267 S.W.3d 9 (Tex.2008). In *Trammell Crow,* the court, after applying the *Timberwalk* factors, concluded that the property manager defendant in that case could not have reasonably foreseen or prevented a crime committed by third parties, and, thus, the court held that the property manager owed no duty to a patron who was shot on one of its properties. *Id.* at 17. The reasoning applied in *Trammell Crow,* like the reasoning applied in *Timberwalk,* should not apply to the instant case, for the same reasons discussed here. Moreover,

Chief Justice Jefferson, in a concurring opinion, explained that bare application of the *Timberwalk* factors might not allow for consideration of all relevant factors. *See id.* at 18 (Jefferson, J., concurring). For example, Chief Justice Jefferson noted that the "prior-similar-incidents inquiry" under *Timberwalk* does not properly "account for crimes that may have been eminently foreseeable despite their never having occurred at a particular place before." *See id.* at 19. This same reasoning applies here. Although the record does not show that Love had been previously convicted of aggravated robbery, his conduct in this case was reasonably foreseeable.

show up at the restaurant. Rather, Barton specifically complains that a Whataburger night-time manager, who had previously been convicted of selling narcotics, actually planned the robbery that resulted in the death of her son. A plaintiff in Barton's position will not be able to establish the *Timberwalk* factors because her claims are based not upon a premises defect, but, rather, upon the negligent acts and omissions of an employer.

Likewise, Barton is not complaining of "the diabolic conduct" and the random violent act of some strange third party. Her complaint is focused on Whatabuger's negligent acts and omissions in hiring Love and then placing him in a management position in which he had responsibility over and for her son. As a Whatabuger night-time manager, Love most certainly should not have conspired with Marshal and then placed Dean in Marshall's path of destruction and death. Marshall did not pick the Whataburger restaurant at random. Rather, Marshall attempted to rob the Whataburger restaurant because the Whataburger night-time manager solicited him to do so.

Accordingly, the panel's holdings that Barton failed to raise a fact issue on the *Timberwalk* factors and that the conduct of Marshall was a superseding cause of Dean's death unforeseeable to Whataburger are in serious error. *See* Tex.R.App. P. 41.2(c).

## Conclusion

In sum, I would hold that the trial court erred in granting summary judgment in favor of Whataburger on the issue of forseeability, and this Court should reverse the trial court's judgment and remand for further proceedings. At the very least, Barton's evidence raises a fact question on the issue of foreseeability. In concluding otherwise, the panel erroneously charac-

terizes the inherent relationship between narcotics dealers and violent crime as "stereotypical" and erroneously conflates the duties owed by premises owners with the duties of employers to their employees resulting in a serious error. Accordingly, I respectfully dissent from the denial of en banc reconsideration. *See id.*

EVELYN V. KEYES, Justice,
concurring in dissent from the denial of en banc consideration.

I agree with Justice Jennings that the trial court erred in granting summary judgment in favor of Whataburger on the issue of foreseeability and that the panel erroneously conflates the duties owed by premises owners with the duties of employers to their employees. Therefore, I join Justice Jennings' opinion dissenting from denial of en banc review.

In particular, I agree that the character of the business for which an employee is hired makes a difference with respect to the foreseeability of a crime. *See Kendrick v. Allright Parking,* 846 S.W.2d 453, 456 (Tex.App.-San Antonio 1992, writ denied) (holding that when business is "prone to attract crime because of the particular character of the business or its previous experience," operator has duty to exercise reasonable care to protect invitees from intentional injuries caused by third parties if he knows or has reason to know from observation or past experience that criminal acts are likely to occur "either generally or at some particular time"); *see also Nixon v. Mr. Property Mgt. Co., Inc.,* 690 S.W.2d 546, 549–50 (Tex.1985) (holding that criminal conduct of third party is not superseding cause that relieves negligent actor from liability when criminal conduct is foreseeable result of actor's negligence). Here, Whataburger operated a late night eating place, a business identified, according to expert testimony in the case, as one

of the retail establishments with the largest share of workplace homicides. Expert testimony further showed that it is standard industry practice to take extra precautions to ensure the safety of late-night workers and that the area around the Whataburger had a high crime rate. Yet Whataburger hired a manager with two prior felony convictions it could easily have discovered. I agree with appellants and with Justice Jennings that the nature of Whataburger's business established a basis for foreseeability to show negligence. *See Ernst & Young, L.L.P. v. Pacific Mut. Life Ins. Co.*, 51 S.W.3d 573, 581 (Tex. 2001) ("General industry practice or knowledge may establish a basis for foreseeability to show negligence. . . .").

I also agree with appellants that "[i]n creating and maintaining the conditions of employment, the master has a duty to his servants to have precautions taken which reasonable care, intelligence, and regard for the safety of his servants require." *See* RESTATEMENT (SECOND) OF AGENCY § 493 (1958). The duty to provide a safe workplace obliges employers to act with "special knowledge," i.e., with "such knowledge as to the conditions likely to harm his servants as persons experienced in the business and having special acquaintance with the subject matter have." *See id.* § 493 cmt. a, § 495 (1958). Thus, an employer owes "a duty to utilize any additional knowledge which in fact he has for the protection of his servants." *Id.* § 495 cmt. b. The duties of masters to their servants apply to negligent hiring, which is at issue here. Thus, I further agree with Justice Jennings that the panel errs in applying the *Timberwalk* analysis applicable to premises liability cases to this negligent hiring case. *See Timberwalk Apartments, Partners, Inc. v. Cain*, 972 S.W.2d 749, (Tex.1998); *Trammell Crow Cent. Texas, Ltd. v. Gutierrez*, 267 S.W.3d 9 (Tex.2008) (applying *Timberwalk* factors in determin-

ing that property manager defendant could not have reasonably foreseen or prevented crime committed by third parties).

For the foregoing reasons, I would grant en banc review.